JAKOBSEN v. SPRINGER et al.

SPRINGER v. JAKOBSEN et al.

(Circuit Court of Appeals, Fifth Circuit. May 17, 1898.)

No. 687.

1. COLLISION—STEAMERS IN RIVER—VIOLATION OF NAVIGATION RULES.

Two steamers, one ascending and the other descending along the left bank of a broad, straight stretch of the Mississippi river, *held* both in fault for a collision between them,—the descending vessel for faulty construction, rendering it difficult to check her speed, and for being out of her proper course, in the path of ascending vessels; the ascending vessel for starboarding her helm instead of porting, as required by navigation rules 18 and 19 (Rev. St. § 4233).

2. SAME—MUTUAL FAULT—DAMAGES—LOSSES OF CREW.

In case of mutual fault, members of the crew of one vessel, who lose personal effects, may recover from the other only half their damages.

3. SAME—PASSENGERS.

In cases of mutual fault, the personal representatives of passengers lost with one of the vessels may recover full damages from the other, but the latter may recoup one-half thereof from the half damages awarded to the owners of the former vessel.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

This cause arises from a collision on the night of January 27, 1897, between the steam yacht Argo, 101 feet long, 6 feet draft, and the Norwegian steamer Albert Dumois, a freight vessel, 210 feet long, and 17 feet draft, in a straight stretch of the Mississippi river, half a mile wide, and about 80 miles below the city of New Orleans. The Argo was under special charter of a newspaper company to make a quick trip to the mouth of the Mississippi river and return. She started about 7 o'clock p. m. on that day, and had on board at the time a master, who served also as a pilot; an engineer; a fireman; one deckhand; one steward, who served also as a cook. The undertaking was under the direction of H. G. Hester, representative of the newspaper company; and his party consisted of himself, A. Faure Bourgeois de Blesine, A. C. Lindauer, newspaper correspondents, and one Cranz, an invited guest. According to her inspection certificate, the Argo should have had one pilot, one engineer, and a crew of five men; but as there was great hurry to get her away, so as to be present at the mouth of the river at the time of the arrival of a congressional committee to inspect the jetties (which had preceded them on the steamship Whitney), to report said committee's proceedings, Messrs. Hester, Lindauer, and Blesine, all of whom were said to be familiar with the management of water craft, agreed in case of necessity to lend a hand and act as part of the crew. The Argo sped rapidly down the river, without delay or accident, until, between 12 and 1 o'clock in the morning of January 28, 1897, she came in collision with the Albert Dumois, striking her on the starboard bow 10 or 12 feet abaft the stem, damaging herself so badly that she sunk in a few minutes thereafter; her crew and passengers all escaping, except Hester and Blesine, who were drowned. The Dumois made a search of an hour or more, trying to find the missing men, and then brought the remainder of the crew and passengers to the city of New Orleans. On the same day the Dumois reached New Orleans, Oscar M. Springer, owner of the Argo, filed his libel in rem against the Dumois, claiming that she was entirely in fault, asking $40,000 damages. Shortly thereafter the crew of the Argo filed their intervention, claiming various small sums, to the value of their personal effects lost by the sinking of the Argo; and thereafter Mrs. Blesine, mother of the deceased Blesine, filed her libel in personam against Anders Jakobsen, who had appeared, through the steamship's master, and claimed to be the sole owner of said steamship; alleging that said Blesine died without

Issue, having no wife or father living, leaving her his only surviving parent, and alleging said collision and death were solely caused through the fault, negligence, and improper conduct of those in charge of the steamship, and asking for $20.000 damages. After filing his claim, Jakobsen, owner of the Dumois, filed a petition claiming the benefit of the limited liability act, and asked that the said vessel and her pending freight be appraised and released on bond. Thereupon an appraisal was had, and the value of the vessel and freight appraised at $31,333.75, and an order was rendered restraining further proceedings against said vessel; and a monition was published for three months, calling on all parties having or pretending to have claims against the said vessel to appear before a commissioner and present the same. Under this monition, Mrs. Hester, the widow of H. G. Hester, filed her petition, alleging that her said husband had lost his life through the fault of those in charge of the said Dumois, and claiming damages in the sum of $20,000. By agreement the libel of Mrs. Blesine was filed as a claim under said monition, and to be treated as an answer to the petition of Jakobsen, denying fault on the part of the Dumois, and asking that all claims be made against said bond, and not against the steamship. The libelant Springer filed an answer denying all the allegations, and surrendering the wreck of said Argo, and any charter money that might be due to him and to any and all parties in interest. On the hearing the district court decided that the Dumois was solely in fault, and rendered decrees against the fund in favor of Springer, owner of the Argo, for $11,000; Mrs. Hester, $5,000; Mrs. Blesine, $2,500,—and for the crew of the Argo the following amounts: One Broadhurst, $51.45; Orkney, $20.25; Jewett, $25.50; Brown, $213; Green, $5; and Diseamus, $4. From this decree the owners of the Dumois appealed, claiming, among other errors, that the court erred in finding the Dumois in fault, and in not finding the Argo solely in fault; and thereupon O. M. Springer, the owner of the Argo, also appealed, claiming that the court erred in not finding a higher value than $11,000 for the Argo.

Richard De Gray, for Springer, Mrs. Blesine, and crew.

George Denegre, for Mrs. Hester.

John D. Rouse and William Grant, for claimant Jakobsen.

Before PARDEE and McCORMICK, Circuit Judges, and SWAYNE, District Judge.

PARDEE, Circuit Judge (after stating the facts). Prima facie, a collision between an ascending and a descending steamer, in a straight stretch of the Mississippi river, where it is half a mile wide, can only result from gross mismanagement in the handling of both steamers, unless there is intended and carried out a deliberate purpose on the part of the one to run the other down. In case each vessel is anywhere near its proper place, they are necessarily too far apart to make a collision possible. The case in hand is no exception to the rule. It is admitted by the pleadings and shown by the evidence that at the time the Dumois and the Argo first came in sight of each other the Dumois was ascending the river in her proper place, near the left bank. That the Argo was at the same time descending the river near the same bank, and out of her proper place, which was the middle of the river, is clear, by the preponderance of the evidence, supported as it is by conclusions that necessarily follow from admitted facts. Lombard, the pilot of the Dumois, who was keeping a lookout on the bridge, and Sibitsen, the mate, who was with him, also, on watch, each testify that when he first distinguished the Argo he saw her red, green, and white lights dead ahead,—if anything, a little inside; that is, a little nearer the left bank than the Dumois. Lar-

sen, able seaman, who was on watch, and afterwards at the wheel of the Dumois, says that the Dumois was about a half a ship's length from the left bank when he saw the lights of the Argo to the starboard of the Dumois, and this was after some signals had been exchanged. Nicholas Theodore, pilot on the tug Day Dream, which, with its tow, was about to land at the lugger landing on the left bank, just above where the collision took place, says that the Argo passed so close to him that he could see her color; that she was about 50 feet from him, and he was afraid she would run into him. E. R. Green, cook on board the Argo, says that when he heard the first whistle of the Argo he went up on the steps and looked out, and saw all the three lights of the Dumois. Capt. Brown, master and pilot of the Argo, and who was the only man on watch at the time, although Diseamus, seaman, stood by him, admits passing the tug Day Dream and giving her a signal of passage, and immediately after admits first seeing the Dumois, but only the white and red lights of that vessel, which he says were on his port bow. Diseamus saw only the lights that Capt. Brown saw. One Nicholas Dedes, pilot of the tug Day Dream, says that they were about making a landing on the east bank of the river when the Argo passed, blowing one whistle. He does not undertake to say where the Argo was when she first signaled the Dumois. One Capt. Jurisch, on one of the luggers in tow by the Day Dream, testifies to the signal between the Argo and the Day Dream, but gives no satisfactory evidence as to where the Argo was at the time she first came in sight of the Dumois. From this evidence, and from legitimate conclusions from admitted facts, it is clear that at the time the Argo first sighted the Dumois the Argo was out of her proper course, unnecessarily, in the path of ascending vessels. This fact being established, it is very easy to reconcile the other evidence, conflicting though it may be, as to the lights, course, and management of the respective ships, resulting in the collision. The master of the Argo admits that after sighting the Dumois, and before changing his course, he waited for the Dumois to give the passing signal, and that, the Dumois not giving the passing signal, he himself gave it,— one whistle, meaning to pass to the right,—and thereupon, or very soon thereafter, put his helm to port. Notwithstanding the cross signal of two whistles then given by the Dumois, and the apparent direct change of course of the Dumois in accordance with its signal, and the continuance of the Dumois upon its changed course, the master of the Argo, believing in the speed of his vessel, and that he could run around and pass to the right of the Dumois in any event, kept his course until he struck the Dumois and sunk his vessel. We quote from his deposition:

"Q. Well, how far away was the boat when you first saw her, before you gave the signal? A. She was about three-quarters of a mile away, I guess; about three-quarters of a mile, the way I was going. I understand it now; yes, sir; I saw her some time before I blew the first whistle. Q. You understand, of course, which vessel should blow first? A. It was her place to blow first. That is what I was waiting for. Q. And when she didn't blow— A. I blew. Q. You blew because she didn't blow for you first? A. Exactly. * * * Q. Did you blow for the Dumois after you passed abreast of the luggers at the canal? A. Yes, sir; I blew, but I waited some time for him to

blow, and he didn't blow. Then I blew one whistle as he was on the east shore. Q. After you passed the Day Dream? A. Yes, sir. Q. How far were you past the Day Dream and her luggers when you blew the whistle first? A. I suppose I was not more than about—very little distance—about five or six seconds, seven or eight seconds. * * * Q. Why didn't you blow the signals of alarm when you first discovered the lights of the Dumois? A. Because I had no business blowing the alarm then, because I was on my right course; and I blew one whistle to him, and he answered by two, crossing my signal, which I suppose any man would have altered his signals and stopped his ship, coming that close to each other. Q. You didn't sound that one blast of the whistle until you had passed the Day Dream, when you were less than half a mile from the Dumois? A. No, sir. Q. When did you sound it? A. I sounded the whistle half a mile from the Dumois; that is, the first whistle. I was going very fast, captain. Q. You understand the rule to be, then, that, when an ascending vessel gives the signal for sides, that the descending vessel may give her signal for sides? A. Yes, sir; I was waiting for him to do it, and I thought I would have to do it; couldn't wait any longer; and so I blew one whistle, and he answered me back two whistles, crossing my signal. Then I blew one immediately afterwards,—one whistle,—then immediately afterwards, and ported my helm quick, when he blew his two whistles. Instead of blowing his two whistles, he ought to have stopped according to the rules, and backed his ship. I ported my helm right away, to get out of the road, immediately after the two whistles were blown by him. Q. What interval of time elapsed between your first and second whistle? A. I suppose it was not very long. Let us see; about—not more than about 15 seconds. Q. Then you put your helm hard a-port? A. I put my wheel hard a-port, and, the velocity I was going, I made sure I would go clear of him. That any sane man would go across my bow, I thought it was too much altogether. I have been on this river 40 years, and I never knew anybody to do like that. Q. Why didn't you stop and back after you saw the Dumois crossing your signal? A. It was too late then. I thought I could clear her. Q. It was not too late to port your helm? A. I ported my helm after I blew the second whistle. She never blew any more whistles. Q. Why didn't you stop after you blew the second whistle? A. Because my judgment said I could clear her, with the velocity I was going. Q. That is the reason you never attempted to reverse,—check your speed? A. No, sir; I made sure I would clear her. That is the reason. You could see yourself when I struck her eight feet from the stem. If that ship was backing when they rung the alarm, I would have cleared her two or three hundred feet."

The fault of the Argo is too clear to require further discussion, and it is hardly necessary to add that at the time she was short of her regulation crew. The substitution of passengers to work in case of necessity may satisfy inspection officers, but ought not to deceive the court. She was not constructed so that her speed could be checked when required by the rules of navigation, or that she could be backed within any reasonable time after sighting danger; and, withal, she was running recklessly in the nighttime, with substantially only one man on watch, in the path of ascending vessels, trusting to her speed and management to keep out of trouble.

The fault of the Dumois is not so apparent. She was properly officered, manned, and equipped; had a regular licensed pilot on board; carried the regulation lights; was in a place where she had a right to be at the time the Argo was sighted. Ahead of her, almost within hailing or signaling distance, the tug Day Dream was either landing, or had just landed, showing all the lights of such a tow. In addition, coming towards her, showing three lights at an even height (the red, green, and white lights), was the Argo. From the evidence, the Argo signaled first to pass to the right, and ported her helm

accordingly. The Dumois, either not hearing this signal, or not willing to permit the Argo to pass to the right, crossed the Argo's signal, and gave two whistles to pass to the left, and apparently immediately put her helm to starboard, changing the course of the vessel from straight up the river along the left bank to across the river, or towards the right bank. Notwithstanding the failure of the Argo to answer with two whistles, the Dumois kept her course, and only stopped and reversed her engines when the collision was apparently inevitable. Rules 18 and 19 (section 4233, Rev. St.) are as follows:

"Rule 18. If two vessels under steam are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other. Rule 19. If two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way of the other."

According to these rules, the Dumois, instead of insisting on keeping her course, should have ported her helm, and she would have avoided the collision. As soon as the Argo ported her helm, and showed only her red light to the Dumois, and the Dumois had starboarded her helm, showing only the green light to the Argo, the vessels were in the fifth position foreseen and provided for by the rules of the supervising inspectors, to wit:

"This is a situation requiring great caution; the red light of A. in view to B. and the green light of B. in view to A. will inform both that they are approaching each other in an oblique direction. B. should put his helm to port and pass astern of A., while A. should continue on his course or port his helm, if necessary to avoid collision, each having previously given one blast of the steam whistle, as required by the rules when passing to the right."

And the Dumois should have put her helm to port, to pass astern of the Argo.

As to the value of the Argo, we have examined all the evidence. She had had a varied and interesting career, and at different times unquestionably had different values. The district court allowed $11,000 as her value, probably based upon the testimony of Col. Miller, who testifies that he had had some claim against the owner, and some correspondence with him as to the value of the Argo. In November or December, 1896, the owner expressed himself as willing to sell the Argo for $12,000, but claimed that it would be a tremendous sacrifice, and that whoever bought her at that price would be getting a bargain. He was anxious to sell, and would allow one or two thousand dollars commission. The owner himself testifies that the day previous to the collision he had sold a half interest in her for $7,500, and that the sale was not concluded only because the Argo was sunk; and this

evidence is corroborated by one Bagley, the intending purchaser. There seems to be no dispute as to this fact in regard to the value of the Argo, and giving effect to the same, and further considering the general average of the values of the Argo fixed by the witnesses, we find that the value of the Argo at the time of the collision was $15,000.

The assignments of error not relating to the fault of the vessels nor to the value of the Argo are not well taken.

Hester and Blesine were passengers aboard the Argo. The claim that they were part of the crew of the Argo is not sustained by the evidence.

Finding as we do both the Dumois and Argo in fault, the decree of the district court must be reversed, and a new decree, adjusting the damages, entered. The crew of the Argo who lost effects by the collision are entitled to recover only half their damages from the Dumois, and, as the Argo was in fault, nothing from their own ship. The Queen, 40 Fed. 694; The City of Norwalk, 55 Fed. 102. Hester and Blesine being passengers on board the Argo, and not in fault, their representatives are entitled to recover full damages from the Dumois; but the Dumois is entitled to recoup half the damages so paid, and deduct the same from the amount awarded to the owners of the Argo. The Hercules, 20 Fed. 205; The North Star, 106 U. S. 17, 1 Sup. Ct. 41. The Argo, being a total loss, can recover one-half her value from the Dumois, less one-half the damages suffered by the Dumois, shown by the record to be $185. Decreed accordingly.