THE MODEMI.

No. 19039.

District Court, E. D. Louisiana.
Sept. 30, 1931.

Bigham, Englar, Jones & Houston, T. Catesby Jones, and James W. Ryan, all of New York City, and Dart & Dart and Henry P. Dart, Jr., all of New Orleans, La., for libelants.

J. D., M. A. & E. H. Grace and John D. Grace, all of New Orleans, La., for claimants.

BORAH, District Judge.

This is a libel in rem by certain cargo interests, owners of cargo on board the Swedish steamship Hermes, and by a passenger owning personal effects on board her, against the Norwegian steamship Modemi. The claim for the loss of the cargo and effects arises out of a collision which occurred between these vessels in the Mississippi river opposite Concession Plantation at about 10:18 p. m. on the evening of March 8, 1928.

▇▇▇ The Hermes interests are not parties to this litigation, and it is not necessary to deal with possible contributory fault on the part of said vessel, as the issue here involves the single question of whether or not there was any fault on the part of the Modemi. If the Modemi was solely or only partially at fault, I take it that in either event the cargo interests and the passenger are entitled to a recovery in full. The Atlas, 93 U. S. 302, 23 L. Ed. 863; Little v. Hackett, 116 U. S. 366, 6 S. Ct. 391, 29 L. Ed. 652; The Chattahoochee, 173 U. S. 540, 19 S. Ct. 491, 43 L. Ed. 801; Jakobsen v. Springer (C. C. A.) 87 F. 948; U. S. v. City of New York (D. C.) 8 F.(2d) 270. In determining this issue where as here the conditions were favorable to safety and it is apparent that the collision could not have occurred without gross fault on the part of one or both vessels, it is not necessary, in endeavoring to locate this fault to reconcile the conflicting testimony of the two vessels or to settle disputed questions of fact. It is necessary only to consider whether the Modemi, from the testimony of her own witnesses, was guilty of fault contributing to the collision. The Albert Dumois, 177 U. S. 240, 20 S. Ct. 595, 44 L. Ed. 751.

On the evening of the day in question the Modemi was proceeding down the river, in charge of a licensed pilot, bound for sea. Her trip down the river was without incident until reaching Belle Chasse; there she heard a fog signal from the ascending Hermes indicating a condition in the lower reaches of the river that she had not yet encountered, as it was only slightly hazy where she was and the low lying fog had not as yet commenced to rise. The Modemi proceeded on down stream, her master, pilot, chief officer, and helmsman on the bridge, and,

when abreast of Scarsdale Light and with her position then in the middle of the river or slightly over towards the east bank, she headed down under her pilot's orders to Oak Point Light on a compass course of SSW and this course she maintained without change up until the time of collision, save for the hard aport order that was executed when the vessels were not over a ship length apart. While proceeding on this course, the Hermes, then at a distance of between two and three miles, was observed by Pilot McKnight as bearing "a little" on the port bow. In point of time this was approximately ten minutes before the collision, and the Hermes, according to Pilot McKnight, was then ascending the easterly side of the river at a point between Stella and Dalcour, and her head and range lights were both in line.

The Hermes, according to the statements of her crew, was at that time proceeding up the middle of the river, and it is said that she then blew a passing signal of one blast, ported her helm so as to direct her course about one point to starboard, and then stopped her engines for two or three minutes, waiting for the Modemi to pass her bow; that, when the Modemi had passed her bow and the vessels were between one-half mile and a mile apart and in a position to pass port to port with between 150 and 200 feet of clear water between them, the engines of the Hermes were put full speed ahead and the helm hard aport to throw her bow still further over to the east bank. However, according to the testimony of Hagglof, master of the Hermes, the Modemi continued to change bearings towards aft on the port side until four points cn the port bow of the Hermes, when she steered straight into the Hermes and her stem struck the No. 2 hatch on the port side and sank her.

▇▇ Be this as it may, the pilot in charge of the navigation of the Modemi knew that the situation between the two vessels at the time they sighted and began to maneuver with respect to each other was one of passing and not of crossing, and, although he immediately replied to the signal of the Hermes with one blast, he did not order the helm of his vessel to port so as to alter her course to starboard as he was required to do under rule I, but doggedly held to the SSW course.

Shortly after this exchange of passing signals, the top lights of the Hermes began to open up and her lower headlight was observed slightly to the right of the higher

range light. Subsequently the colored lights came into view; first the green, later the green and red, and finally the red light appeared. When the top lights of the Hermes began to change and open up in the fashion indicated, the pilot of the Modemi mistakenly assumed that the Hermes was steering bad, and it looked to him as though she was changing her heading and coming over to the west bank in violation of the agreement. Norbom, master of the Modemi, was apparently of the same opinion, and stated that ten minutes before the collision he observed the Hermes change her course to port across the bow of the Modemi and thereafter she maintained a course that would bring her close to the bow of the Modemi up until a few seconds before the collision. The chief officer thought likewise, for he testified that it was at all times apparent to him that the Hermes was crossing the bow of his vessel up until a few minutes before the collision, when she started to change course to starboard.

An examination of the government charts at that point discloses that this is precisely what those on the Modemi should have normally expected to see on a vessel approaching from the opposite direction, for there is a curve in the river between Scarsdale and Oak Point, and to a descending vessel this curvature is to the left and is sufficient to cause approaching vessels to slightly expose opposite sides notwithstanding their courses diverge less than one point. But those on the Modemi were inattentive to the slight winding of the river above Oak Point, and erroneously assumed that the situation was one of crossing instead of passing, whereas those changes in lights simply indicated that the Hermes was following the usual course up the river parallel to the banks and that the situation was an ordinary one of vessels approaching each other on opposite courses under rule I. A plotting of the various positions and courses on the charts also shows that, no matter whether the Hermes was ascending the middle or easterly side of the river when she was first sighted by the Modemi, it was in either event impossible for her to be more than one point on the port bow of the Modemi if the latter was on a course in the middle of the river parallel to the banks, as she says she was, and this fact would not be altered if the Modemi was then on a SSW magnetic course.

It is also significant to observe that the Modemi in following the SSW course from abreast Scarsdale to Oak Point would be traveling on the east side of the river until passing the point opposite Concession, and from then on she would begin to gradually cross the river from east to west until arriving at Oak Point Light. This fact indicates most forcibly that she was on the Hermes side of the river where she had no right to be, and I am persuaded that this is true, though there is uncontroverted testimony in the record by McCarthy, a river pilot, that a current otherwise estimated as being two and a half miles per hour would have a tendency to carry a vessel to the west bank and into the bend at Concession if said vessel were running the customary SSW course. The testimony of this experienced pilot is undoubtedly true, but it is not susceptible to the interpretation for which the respondent contends. A reading of the testimony will show that the witness' opinion is based on the assumption that the vessel would change to a SSW course when abreast of Belle Chasse; that in making this change she would be on the westerly side of the stream and would continue to remain in the same relative position when abreast of Scarsdale Light. But the situation here is entirely different. The testimony is all one way that the Modemi changed to a SSW course when abreast of Scarsdale Light and it is respondent's contention that she was then in the middle of the river, though her pilot said she was "a little bit on the east bank." Indeed it is difficult to conceive how respondent can gain any comfort from the testimony of McKnight, for he stated that it was most improper to be on the easterly side of the river and furthermore that if, when abreast of Scarsdale Light, a ship is to the eastward of the middle of the river, it would be impossible for that ship to get over into Concession Bend on a SSW course.

After all, it matters little in the final analysis whether the collision took place on the easterly side of the river or in the middle of the river, because the situation was clearly one of passing and the Modemi had answered with one blast the one blast of the ascending Hermes and had thereby agreed that each would port her helm so as to effect a port to port passing in accordance with rule I. However, notwithstanding that she accepted the situation as being a meeting end on, she grievously failed to port her helm to alter her course to starboard and left to the Hermes the entire effort to carry out the agreement which both vessels were required under the rule to help execute.

The situation was clearly one of passing, and the crossing rule has no application. But, even if the crossing rule were applicable, the Modemi both failed to invoke it and violated it in these particulars: Every witness who was interrogated on the subject testified that the Modemi did not, as rule IX would require, blow the first one blast to the Hermes as "having the other on her own port bow." If that was the situation, it was her duty as the descending vessel to blow first. It is only under rule I that the ascending steamer blows the first blast; therefore those on the Modemi knew when they heard the one blast from the Hermes that she was invoking rule I. By answering that signal with one blast instead of blowing the danger signal, she violated rule IX and misled the Hermes into believing that she had accepted a passing situation under rule I. If rule IX were applicable and the Modemi was the privileged vessel, she was likewise at fault for having failed to maintain speed, in that she increased speed from slow to half ahead six minutes before the collision and again changed speed from half to slow ahead three minutes before the collision.

The Modemi also violated rule XI for special circumstance. On her own testimony she was grossly at fault for having failed to take any precautions when danger of collision was or should have been apparent. According to the testimony of her own witnesses the Hermes as much as ten minutes before the collision had strongly indicated that she was violating her agreement to pass port to port, and it was further obvious to the pilot of the Modemi that it was impossible for the Hermes to avoid collision by porting her helm, as he admitted that the collision would have occurred regardless of the fact that the Hermes directed her course to starboard shortly before the collision. Nevertheless, the engines of the Modemi were still working ahead at the time of the collision. Under these circumstances it was her plain duty to sound the danger signal and stop and reverse her engines as soon as she saw that the Hermes was changing her course and was violating her agreement to pass port to port. In fact, this duty is obligatory under rules I, II, IX, and XI of the Mississippi River Pilot Rules.

An interlocutory decree may accordingly be entered awarding to libelants a recovery against the Modemi, together with interest and costs, with the usual order of reference to the commissioner to report the amount of the libelant's damages.