# THE ALBERT DUMOIS.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH
CIRCUIT.

Nos. 139, 272.   Argued January 31, 1900. — Decided April 9, 1900.

In January, 1897, the navigation of the Mississippi River below New Orleans
was governed by the rules and regulations of 1864, (Rev. Stat. sec. 4233)
and also by the supervising inspectors' rules for Atlantic and Pacific in-
land waters.

A steamer ascending the Mississippi within 500 feet of the eastern bank,
made both colored lights of a descending steamer, approaching her " end
on, or nearly end on." She blew her a signal of two whistles and star-
boarded her wheel. *Held:* That she was in fault for so doing, and that
this was the primary cause for the collision which followed. *Held* also:
That the fact the descending steamer seemed to be nearer the eastern bank
and that her lights were confused with the lights of other vessels moored
to that bank, was not a "special circumstance" within the meaning of
Rule 24, rendering a departure from Rule 18 necessary "to avoid imme-
diate danger," since if there were any danger at all, it was not an imme-
diate one, or one which could not have been provided against by easing
the engines and slackening speed.

Exceptions to general rules of navigation are admitted with reluctance on
the part of courts, and only when an adherence to such rules must almost
necessarily result in a collision.

The descending steamer, running at a speed of twenty miles an hour, made
the white and red lights of the Dumois, the ascending steamer, upon her
port bow, and blew her a signal of one whistle to which the Dumois re-
sponded with a signal of two whistles, starboarded her helm, shut in her
red and exhibited her green light. *Held:* That the descending steamer,
the Argo, in view of her great speed, should at once upon observing the
faulty movement of the Dumois, have stopped and reversed, and that her
failure to do so was a fault contributing to the collision; and that the
damages should be divided.

While a steamer may be so built as to attain the utmost possible speed,
she ought also to be provided with such means of stopping or changing
her course as are commensurate with her great speed, and the very fact
of her being so fast and apparently uncontrollable is additional reason
for greater caution in her navigation.

The nineteenth rule, which declares that the vessel which has the other on
her own starboard side shall keep out of the way of the other," does not
absolve the preferred vessel from the duty of stopping and reversing, in
case of a faulty movement on the part of the other vessel.

The representatives of two passengers on the descending steamer who lost their lives, filed a libel against the owner of the ascending steamer for damages, and recovered. *Held :*. That as both vessels were in fault, one half of such damages should be deducted from the amount recovered from the Dumois, notwithstanding that the local law gave no lien or privilege upon the vessel itself.

The limited liability act applies to cases of personal injury and death, as well as to those of loss of, or injury to, property.

THIS was a libel in admiralty filed by Oscar M. Springer, owner of the steamer Argo, a small vessel of forty-eight tons burthen, against the steamship Albert Dumois, to recover damages sustained by a collision between these two vessels in the early morning of January 28, 1897, in the Mississippi River, about eighty miles below the city of New Orleans. An intervening libel was also filed against the Dumois by the crew of the Argo, to recover the value of their clothing lost by the collision.

Upon the seizure of the Dumois, one Anders Jakobsen, of Christiana, Norway, appeared as claimant and owner, and on February 3, 1897, filed a petition for a limitation of liability, in which he also denied any negligence on behalf of the Dumois. Upon the same day, Marie B. Bourgeois de Blesine, mother of Faure de Blesine, a passenger on board the Argo, filed a libel *in personam* against Jakobsen, claiming damages for the death of her son through the negligence of the Dumois. Her suit was thereupon consolidated with that of Springer, and treated as a petition against the stipulation given for the release of the steamer under the proceedings for a limitation of liability. Upon the appraisement of the Albert Dumois at the sum of $30,000, and pending freight at the sum of $1333.75, and the filing of a stipulation to pay these sums into court, an order was issued enjoining further proceedings against the steamship and her owner, and directing all persons claiming damages by reason of the collision to appear before a commissioner and make proof thereof.

On May 5, 1897, Genevieve Keplinger Hester, widow of Harrison P. Hester, a passenger on the Argo, and natural tutrix of his minor child, filed an intervening petition under the limited liability proceedings, claiming damages for the death of her

husband, and alleging that the same was caused solely through the fault of the Dumois.

Thereafter, on December 16, 1897, Springer, as the owner of the Argo, filed a surrender of his vessel and pending charter money to the intervening claimants against the Dumois, and prayed for relief under the limited liability act.

The case of the Argo as set forth in her libel, and answer to the petition of the owner of the Dumois for a limitation of liability, was this: On January 27, 1897, at seven o'clock in the evening, the Argo started from the port of New Orleans on a trip to the jetties at the mouth of the Mississippi River. Upon the following morning, about 12.40 A. M., while proceeding down the middle of the river, at or near Oyster Bayou, the master noticed the white and red lights of a steamer coming up stream about 500 feet from the east bank and immediately gave a signal of one blast of his whistle, signifying that he would turn to starboard and pass on the port side of the approaching steamer, to which the latter responded with two blasts of her whistle, and began crossing the river, shutting out her red and showing her green light. Thereupon the Argo promptly responded with one blast of her whistle, still claiming her right to pass on the port side of the approaching steamer, and put her helm hard-a-port to clear the Dumois, as she had the right to do, and as in the judgment of her master it was best for her to do. Whereupon the Dumois continued her course across the river and blew a danger signal of three blasts of her whistle, but too late to avoid a collision, the Argo striking the Dumois while she was crossing the Argo's bow about eight feet abaft her stem, causing the Argo to fill with water and sink about four minutes thereafter, whereby she was totally lost and two of her passengers were drowned.

The case of the Dumois was that, while proceeding up the Mississippi River, about half-past twelve at night, on a voyage from Port Limon, Costa Rica, to New Orleans, with her full complement of officers and seamen, she had reached a point in the Mississippi River, about eighty miles below the city of New Orleans, and was proceeding up the river as close to the east bank as it was safe for her to do, at a moderate speed of about

nine miles an hour, when her watch discovered the lights of a steamer coming down the river close to the east bank, nearly "head and head," but somewhat upon the starboard bow of the Dumois; that the Dumois, before any signal was given by the approaching steamer, gave two clear and distinct blasts of her steam whistle, indicating that she desired to pass the Argo to the left, starboard to starboard, and at the same time her wheel was put to starboard. In answer, the Argo wrongfully responded to this signal with one blast of her whistle. Thereupon the pilot of the Dumois, fearing that the Argo had misunderstood his signal, immediately repeated it, and at once caused three or more short blasts of her whistle to be given in quick succession, to indicate danger, and at the same time stopped and backed her engines; but the Argo neglected to stop and back, and kept her course and speed until her pilot saw the green or starboard light of the Dumois, when he attempted to pass her by putting his wheel hard-a-port, which brought the Argo in collision with the steamship, striking her at right angles on the starboard side, about ten feet abaft the stem, from which collision the Argo sank and became a total loss.

Upon a hearing upon pleadings and proofs the District Court announced in an oral opinion its conclusion that the collision was caused solely by the fault of the Dumois, and awarded the libellant Springer $11,000 for the loss of the Argo; to Mrs. Hester, $5000; to Mrs. de Blesine, $2500, and to the crew of the Argo the respective sums claimed by them.

From this decree the owner of the Dumois appealed to the Circuit Court of Appeals, assigning in substance as error that the collision was caused through the sole fault of the Argo, and that the amount awarded was excessive. An appeal was also taken by Springer, claiming that the amount awarded him as the value of the Argo was too small; but no appeal was taken by the intervening libellants.

The Circuit Court of Appeals reversed the decree of the District Court, holding that both vessels were in fault for the collision, and that as between the owners of the steamships the damages should be divided. It further increased the allowance of damages to Springer to $15,000, and assessed those sustained

by the Dumois at $185. It was further decreed that Springer recover $7,500 of the Dumois and her bondsmen, subject to a credit of one half of the damages of the Dumois, and one half of the amounts decreed in favor of Mrs. Hester and Mrs. de Blesine, leaving a balance due upon this decree in favor of Springer of $3657.50, for which he was awarded execution. 59 U. S. App. 108. Both parties filed petitions for rehearing, which were denied.

Whereupon both parties applied for and were granted writs of certiorari from this court.

*Mr. Richard De Gray* and *Mr. Timothy E. Tarsney* for Springer.

*Mr. Wilhelmus Mynderse* for the Albert Dumois.

*Mr. John D. Rouse* and *Mr. William Grant* filed a brief on behalf of Jakobsen.

*Mr. George Denègre, Mr. J. P. Blair* and *Mr. Walter D. Denègre* filed a brief on behalf of Mrs. Hester.

MR. JUSTICE BROWN, after stating the case as above, delivered the opinion of the court.

This collision occurred in January, 1897, in the Mississippi River about eighty miles below New Orleans, and the steamers in their signals and manoeuvers were governed by the original rules and regulations of the act of 1864, reproduced in Rev. Stat. § 4233. A brief review of the numerous acts subsequent thereto upon the same subject will show that the act of 1864 continued in force upon the Mississippi River at the time of this collision.

1. The original act, now known as Rev. Stat. sec. 4233, was adopted from the British Orders in Council of 1863, was made of general application "in the navigation of vessels of the Navy and of the mercantile marine of the United States," and was supplemented by secs. 4412 and 4413, giving the board of supervising inspectors power to "establish such regulations to be

observed by all steam vessels in passing each other, as they shall from time to time deem necessary for safety."

This code remained in force substantially unaffected by legislation until March 3, 1885, when the "revised international regulations for preventing collisions at sea" were adopted by act of Congress, act of March 3, 1885, c. 354, 23 Stat. 438, and made applicable to "the navigation of all public and private vessels of the United States upon the *high seas* and in all *coast waters* of the United States, *except* such as are otherwise provided for." By section two all laws inconsistent with these rules were repealed, " *except* as to the navigation of such vessels within the *harbors, lakes and inland waters* of the United States." As to such waters, the original code of 1864 remained in force, explained and supplemented by the rules of the supervising inspectors. *The Delaware,* 161 U. S. 459, 463 ; *The New York,* 175 U. S. 187, 193.

On August 18, 1899, Congress adopted a new code "to be followed by all public and private vessels of the United States upon the *high seas* and in all waters connected therewith, navigable by seagoing vessels," act of August 19, 1890, 26 Stat. 320, article thirtieth of which declared that " nothing in these rules shall interfere with the operation of a special rule, duly made by local authority, relative to the navigation of any *harbor, river* or *inland waters.*" The second section repealed all inconsistent laws, and the third section provided that the act should take effect at a time to be fixed by the President by proclamation issued for that purpose. This act was amended by act of May 28, 1894, c. 83, 28 Stat. 82, providing certain lights for small vessels. By another act of June 10, 1896, c. 401, 29 Stat. 381, amending the law with regard to signals, it was declared in the second section that the original act as amended should " take effect at a subsequent time to be fixed by the President by proclamation," although another act approved February 23, 1895, c. 127, 28 Stat. 680, had already provided that it should take effect at a time to be fixed by the President. The President at first declared that the act should take effect March 1, 1895, 28 Stat. 1250, which date was subsequently postponed by another proclamation, 28 Stat. 1259.

By still another proclamation of December 31, 1896, 29 Stat. 885, it was declared that the act of August 19, 1890, as subsequently amended, should take effect July 1, 1897.

Meantime, however, and on February 8, 1895, 28 Stat. 645, Congress passed another code, c. 64, to be "followed in the navigation of all public and private vessels of the United States upon the *Great Lakes* and their *connecting and tributary* waters as far east as Montreal," to take effect March 1, 1895. This act repealed the act of 1864 so far as it applied to the Great Lakes and their connecting waters. All this legislation, however, left the harbors, rivers and other inland waters of the United States unaffected either by the acts of 1885, 1890 or 1895; and to make the intention of Congress more certain in this particular, on February 19, 1895, c. 102, 28 Stat. 672, Congress enacted that the original provisions of sections 4233, 4412 and 4413 of the Revised Statutes, and regulations of the supervising inspectors pursuant thereto, shall be followed on the *harbors, rivers* and *inland waters* of the United States, and the provisions of said sections were declared special rules duly made by local authority relative to the navigation of such waters, as provided for in article thirty of the act of August 19, 1890, above quoted. Section four provided that the words "inland waters" should not be held to include the Great Lakes and their connecting and tributary waters as far east as Montreal, and that the act should not, in any respect, affect the act of February 8, 1895.

Finally on June 7, 1897, c. 4, 30 Stat. 96, Congress adopted a set of regulations to be "followed by all vessels navigating all *harbors, rivers* and *inland waters* of the United States, except the Great Lakes and their connecting and tributary waters, as far east as Montreal, and the Red River of the North and rivers emptying into the Gulf of Mexico, and their tributaries." This act, as well as that of August 19, 1890, adopting regulations for preventing collisions at sea, was amended February 19, 1900, so far as it related to lights on steam pilot vessels; but as this act of 1897 was approved June 7, to take effect four months thereafter, it is unnecessary to consider to what waters it is applicable. It certainly has no bearing upon this collision, which took place

January 28, 1897, and is cited merely as a part of the history of Congressional action upon the general subject.

The effect of all this legislation was at the time of the collision, and perhaps is still, to leave the rivers emptying into the Gulf of Mexico, subject to the provisions of the original act: Rev. Stat. section 4233.

2. If the legislation of Congress in this connection be somewhat complicated, the result is at least clear that the navigation of the Mississippi was subject to the original rules and regulations of Revised Statutes, § 4233; but the rules of the supervising inspectors, supplementary thereto, are ambiguous, and in one respect quite difficult of interpretation. There are three sets of these rules: 1. Pilot rules for Atlantic and Pacific inland waters; 2. Pilot rules for Western rivers; 3. Pilot rules for the Great Lakes and their connecting tributary waters as far east as Montreal. The third may be left out of consideration in this case.

The pilot rules for Western rivers are entitled "Rules and regulations for the government of pilots of steamers navigating the Red River of the North and rivers whose waters flow into the Gulf of Mexico, and their tributaries." There can be no doubt whatever that these rules apply to the Mississippi and its tributaries, and there could be no doubt that they applied to the river below New Orleans, were it not for Rule XIV, which declares that "the line dividing jurisdiction between the pilot rules on Western rivers and harbors, rivers and inland waters, at New Orleans, shall be the lower limits of the city." This should evidently be construed as if it read: "The line dividing jurisdiction between the pilot rules on Western rivers and *the pilot rules* on harbors, rivers and inland waters at New Orleans shall be the lower limits of the city." This excludes the Mississippi below New Orleans, and indicates that some other rules are applicable.

But on referring to the pilot rules for the Atlantic and Pacific coast inland waters, we find them entitled "Rules and regulations for the government of pilots of steamers navigating *harbors, rivers* and *inland waters,* (except the Great Lakes, the Red River of the North, and *rivers emptying into the Gulf of*

*Mexico* and their tributaries,) when meeting or approaching each other, whether by day or night, and as soon as fully within sound of the steam whistle." Rule IX of these pilot rules contains the same provisions as Rule XIV of the pilot rules for Western rivers, namely, that the line dividing jurisdiction between pilot rules on Western rivers and harbors and inland waters at New Orleans shall be the lower limits of the city. There could be no doubt whatever that the intention was to divide the jurisdiction as to the Mississippi River between the rules applicable to Western rivers, and the rules for Atlantic and Pacific coast inland waters, were it not for the fact that in the entitling of these latter rules rivers emptying into the Gulf of Mexico are excepted. But we are of opinion that these words were intended as a general exception of the waters covered by the pilot rules for Western rivers, and that they were not intended to apply to the Mississippi below New Orleans, in view of the provision of both sets of rules that the pilot rules for Western rivers should cease to be applicable at the lower limits of that city. As New Orleans is practically the head of navigation for foreign trade, it was perfectly reasonable that the supervising inspectors should apply to the lower Mississippi the rules and regulations adopted for the harbors, rivers and inland waters navigated by vessels engaged in foreign trade, while they still left the regulations provided for Western rivers to remain applicable to the Mississippi above New Orleans, where the commerce is almost altogether domestic in its character. The only alternative of this proposition is to hold that the supervising inspectors intended to exempt from their jurisdiction altogether the waters of the Mississippi below New Orleans, some 150 miles in length—a supposition so improbable that it must be rejected at once. We hold, therefore, that the Atlantic and Pacific coast rules apply to these waters.

Such being the rules and regulations applicable to this case, we are remitted to the inquiry how far they were obeyed, and how far disregarded by the vessels concerned in this collision. The night was clear and starlight, the river substantially straight at this point and about half a mile wide, with no obstruction or other special circumstances, under Rule 24, rendering a departure

from the general rules necessary in order to avoid immediate danger.   In short, the conditions were all favorable to safety, and the collision could not have occurred without egregious fault on the part of one or both vessels.   In endeavoring to locate this fault we are at liberty to consider the movements of each vessel from its own standpoint, and without attempting to reconcile the conflicting statements of the two crews, or to settle disputed questions of fact, to inquire upon the showing made by each whether that vessel was guilty of fault contributing to the collision.

3. As to the Albert Dumois: She was a Norwegian vessel, 210 feet long, drawing 17 feet of water and was bound up the river to New Orleans.   While proceeding up the east side of the river at a speed of about nine miles an hour, and from 250 to 500 feet from the east bank, she made directly ahead, and at a probable distance of about half a mile, saw the white and colored lights of the Argo coming down the river.   Her theory of the case was, and the entire testimony of her watch showed, that the Argo was approaching her "end on, or nearly end on," within the meaning of Rule 18, which declares that "if two vessels, under steam, are meeting end on or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other." Notwithstanding this, however, the wheel of the Dumois was put to starboard, and a signal of two whistles blown to the Argo, manifesting an intention on the part of the Dumois to sheer out into the river and pass the Argo starboard to starboard.   Her excuse for doing this was her own proximity to the east bank and a cluster of white lights belonging to a tug and two luggers inside of the Argo, and in fact moored to the east bank of the river.

We cannot, however, accept this as a "special circumstance" within the meaning of Rule 24 rendering a departure from Rule 18 necessary "to avoid immediate danger," since if there were any danger at all it was not an immediate one, or one which could not have been provided against by easing the engines of the Dumois and slackening her speed.   Exceptions to the general rules of navigation are admitted with reluctance on

the part of the courts, and only when an adherence to such rules must almost necessarily result in a collision—such, for instance, as a manifestly wrong manœuver on the part of an approaching vessel. *Belden* v. *Chase*, 150 U. S. 674, 699; *The Britannia,* 153 U. S. 130; *The Test,* 5 Notes of Cases, 276; *The Superior,* 6 Notes of Cases, 607; *The Khedive,* 5 App. Cases, 876; *The Benares,* 9 Prob. Div. 16; Marsden on Collisions, 480. As was said in *The John Buddle,* 5 Notes of Cases, 387: " All rules are framed for the benefit of ships navigating the seas, and, no doubt, circumstances will arise in which it would be perfect folly to attempt to carry into execution every rule, however wisely framed. It is, at the same time, of the greatest possible importance to adhere as closely as possible to established rules, and never to allow a deviation from them unless the circumstances which are alleged to have rendered such a deviation necessary, are most distinctly approved and established; otherwise, vessels would always be in doubt and doing wrong."

The case of *The Concordia,* L. R. 1 Ad. & Ecc. 93, resembles much the instant case in this particular. That was a collision between two steam vessels meeting nearly end on in the river Thames. Defendants alleged that the helm of their vessel was put to starboard to avoid a barge. It was held that the burden of proof that a departure from the rule, which required both steamers to port, was necessary in order to avoid immediate danger, rested upon the defendants, and that in the absence of sufficient evidence to show what became of the barge, the defendants had failed in their proof, and were therefore in fault for the collision, the result of not porting their helm. See also *The Agra,* L. R. 1 P. C. 501.

Manifestly the Argo had a right to rely upon the Dumois pursuing the usual course of putting her helm to port, and her failure to do so was likely to raise a doubt on the part of the Argo as to her own duty, and to bring about the collision it was designed to avoid. If, as insisted by the crew of the Argo, the Dumois was nearer to the east bank than the descending steamer, and exhibited to the latter her white and red lights only, the fault of the Dumois in starboarding and crossing the course of the Argo becomes still more manifest. The fact put

forward by the pilot of the Dumois, that the Argo seemed so close to the luggers that she appeared to be one of them, (although contradicted by the testimony of the libellant that the Argo was in the middle of the river,) was one which undoubtedly called for caution on the part of the Dumois, but it did not involve an immediate danger which justified a departure from the general rule.

4. The Argo, a vessel of forty-eight tons burthen, 101 feet in length and drawing six feet of water, had been chartered by some representatives of the press to meet, at the mouth of the river, a Congressional committee sent to inspect the jetties, and to report the proceedings of the committee. According to her inspection certificate the Argo should have had one pilot, one engineer and a crew of five men, but as they were in great haste to get away, Messrs. Hester, Lindauer and Blesine, newspaper correspondents, all of whom were said to be familiar with the management of water craft, agreed to enroll themselves as part of the crew, and if necessary to lend a hand. Their assistance does not seem to have been of any great value, as they all "turned in" immediately upon coming on board. The Argo left New Orleans about seven o'clock in the evening, having on board a master, who also served as pilot, an engineer, a fireman, one deck hand and a steward, who also served as cook, besides the newspaper correspondents. She took her course down the river at a speed of about twenty miles an hour, and at the time of making the lights of the Dumois was either in the middle of the river or between that and the east bank. There was conflict of evidence upon her exact location, but in the view we have taken of the case it does not become necessary to determine this with accuracy. Her testimony indicates that she made the white and red lights of the Dumois upon her port bow, and blew her a signal of one whistle; that the Dumois responded with a signal of two whistles, starboarded her helm, shut in her red and exhibited her green light, and took her course across the path of the Argo. The Argo again blew her a signal of one whistle, to which the Dumois again responded with two, followed it with a danger signal, and the Argo, still maintaining her great speed, put her wheel hard-a-port, struck

the Dumois upon her starboard bow, and was herself almost immediately sunk by the force of the impact.

The master of the Argo excuses his failure to stop and reverse, which it was his duty to do as soon as he saw the wrong manœuver of the Dumois, by the fact that the starboarding of the Dumois put him in a position in which he was obliged to decide instantly what ought to be done; that, in the exercise of his best judgment, he determined to put his helm hard-a-port, and endeavor to cross the bows of the Dumois; and that, if he made a mistake in this particular, it was an error *in extremis*, for which the Argo is not responsible. The argument is undoubtedly entitled to great weight, but we think the real error was not committed *in extremis*. The theory of the Argo is that she was coming down the middle of the river, and that she made the Dumois on her port bow exhibiting a red light. She was running herself at twenty miles an hour, with the added force of the current. The Dumois was running against the current at the rate of nine miles an hour. That the Dumois must have starboarded and shown her green light some time before the Argo ported, is evident from the place of the collision, which was to the westward of the middle of the river, and, upon the theory of the Argo, was near the westerly bank. As the Dumois was within five hundred feet of the easterly bank when she starboarded,—the river at that point being about 2500 feet wide,—she must have run under her starboard helm about a quarter of a mile before reaching the point of collision. Now, if the Argo had promptly ported as soon as she heard the cross-signal or observed the starboarding of the Dumois, she would inevitably have passed the point of intersection before the Dumois reached it. The fault of the Argo was not in the hard-a-port order when the collision was inevitable, but in failing to stop and reverse at once as soon as she noticed the starboarding of the Dumois. The testimony from the Dumois indicates that she blew her first whistle and starboarded as soon as the Argo's lights were seen, and that if the Argo had starboarded and reversed, the collision would not have occurred. The truth seems to be that the Argo did not port when giving her first signal, but waited for some time, and then put her helm hard-a-port, but too late to be of any avail.

The testimony indicates that the Argo is chargeable with an infraction of the third rule of the supervising inspectors in failing to stop and reverse after receiving the cross-signals from the Dumois. This rule requires that " if, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and repeated blasts of the steam whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway until the proper signals are given, answered and understood, or until the vessels shall have passed each other. Vessels approaching each other from opposite directions are forbidden to use what has become technically known among pilots as ' cross-signals,'—that is, answering one whistle with two, and two whistles with one. In all cases, and under all circumstances, a pilot receiving either of the whistle signals provided in rules, which for any reason he deems injudicious to comply with, instead of answering with a cross-signal, must at once observe the provisions of this rule."

The master also seeks to excuse himself by alleging that the Argo was so constructed that her headway could not have been stopped in time to be of any service. This may be true, and yet the Dumois should not be held responsible for the faulty construction of the Argo in this particular. While a steamer may be so built as to attain the utmost possible speed, she ought also to be provided with such means of stopping or changing her course as are commensurate with her great speed; and the very fact of her being so fast and apparently uncontrollable is an additional reason for the greater caution in her navigation. Her increase of speed should have been obtained with as little increase of risk to other vessels as was possible, and if any precautions in that direction were neglected, it was a fault for which she alone ought to be called upon to respond. This court has repeatedly held the fault, and even the gross fault of one vessel, does not absolve the other from the use of such precautions as good judgment and accomplished seamanship require. *The*

*Maria Martin,* 12 Wall. 31; *The America,* 92 U. S. 432; *The Lucille,* 15 Wall. 676; *The Sunnyside,* 91 U. S. 208.

But counsel for the Argo also insists that, as the two vessels, from the moment the Argo ported and the Dumois starboarded, were upon crossing courses, the nineteenth rule which declares that "the vessel which has the other on her own starboard side shall keep out of the way of the other," applied, and that the Dumois should have ported, and the Argo was bound, under the case of *The Britannia,* 153 U. S. 130, to keep her course and speed. We are reluctant, however, to say that, where two vessels are meeting end on or nearly end on, under the 18th rule, the faulty movement of starboarding by one absolves the other from the obligation of Rule 21, which requires that "every steam vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse."

In the case of *The Britannia,* the decision of the court that of two crossing steamers the preferred vessel should have kept her course and speed, was put upon the ground that the course of the Britannia, the obligated vessel, was precisely what might have been anticipated, and did not warrant the Beaconsfield, the preferred vessel, in disregarding the injunctions of the twenty-third rule, which required her to keep her course. It was intimated that a different conclusion might have been reached if it had appeared that the Britannia was herself violating a rule of navigation. Now, as it appears from the testimony of the Argo's crew that they not only heard the signal of two whistles from the Dumois, but saw her turn under her starboard wheel, and exhibit her green light when she should have ported, they were at once apprised of the fact that she was violating a rule of navigation, and that prompt action was required to avoid a collision.

The fact that the Argo was short handed and was also running without a proper lookout, though not decisive of a fault contributing to the collision, may be taken into consideration as bearing upon the probabilities of the case, and raising a presumption against her.

We are of opinion that the Dumois was primarily in fault

for this collision, in starboarding instead of porting when she first sighted the Argo; and while the case with respect to the Argo is by no means free from doubt, the majority of the court are also of opinion that the Argo was in fault for failing to observe the twenty-first rule, which required her to stop when risk of collision was involved, as well as the third rule of the supervising inspectors to the same effect.

5. There was no error in fixing the value of the Argo at the sum of $15,000 — an increase of $4000 over the amount fixed by the District Court. The evidence of her builders was that she originally cost $18,000, and that, if she had been kept in good repair, she would have been worth two thirds of that amount at the time of the collision. There was also testimony to the effect that her owner had, at the time of the collision, concluded a sale of one half the Argo for $7500, and that it was to have been delivered and the money paid for this moiety on the day following that upon which she was lost, and upon her return to the city. This is better evidence of her actual value than the conflicting opinions of experts more or less friendly to the owner, who put her value at from $8500 to $30,000. As the District Court and the Circuit Court of Appeals agreed that her value did not exceed $15,000, we should be unwilling to increase that amount unless upon clear proof of inadvertence or mistake.

There was no error in refusing to allow interest upon her valuation. The allowance of interest in admiralty cases is discretionary, and not reviewable in this court except in a very clear case. *The Scotland*, 118 U. S. 507, 518.

6. In the assessment of damages an important question arose as to whether a moiety of the amounts awarded to Mrs. Blesine and Mrs. Hester should be deducted from the amount recoverable by the owners of the Argo. The libel of Mrs. Blesine was filed against Jakobsen as owner of the Dumois, and process of attachment prayed against his goods and chattels, credits and effects. This libel, subsequently consolidated with that of Springer, was treated as a petition against the bond given for the release of the steamer under the proceedings for a limited liability. A similar petition was filed by Mrs. Hester. In the

following December, Springer, the libellant and owner of the Argo, surrendered to the claimants and intervenors his vessel and the freight. These intervening libels, as well as that of the seamen, proceeded as one suit, and in the decree of the Circuit Court of Appeals Mrs. Blesine was awarded $2500 and Mrs. Hester $5000, one half of which was deducted from the amount awarded to Springer.

Admitting that if these intervening libels had been filed against Springer as owner of the Argo, nothing could have been recovered of him by reason of the total loss of the Argo and her freight, and the consequent extinguishment of personal liability on the part of the owner, does it follow that the Dumois is not entitled to deduct from the amount awarded to the Argo; or, in other words, to recover of the Argo one half of the amount payable to these libellants, in view of the fact that the Argo was also in fault? We think this question is practically answered by prior decisions of this court.

The case of *The North Star*, 106 U. S. 17, arose from the mutual fault of two steamers, in which one, the Ella Warley, was totally lost. The court awarded the owners of the Ella Warley so much of their damage as exceeded one half of the aggregate damage sustained by both vessels. The owners of the Warley contended that, as she was a total loss, her owners were not liable at all, and that they were entitled to one half of their damages in full, without deduction for the half of the damage sustained by the North Star, the other vessel. We held, however, that the admiralty rule that where both vessels are in fault they must bear the damage equally, applied, and that the one suffering least should be decreed to pay to the other the amount necessary to make them equal, namely, one half of the difference between the respective losses sustained, and that when this resulting liability of one party to the other has been ascertained, then, and not before, was the proper time to apply the rule of limited responsibility, if the party decreed to pay is entitled to it. "It will enable him to avoid payment *pro tanto* of the balance found against him." "The contrary view," said the court, "is based on the idea that, theoretically, (supposing both vessels in fault,) the owners of one are liable to

the owners of the other for one half of the damage sustained by the latter ; and, *vice versa*, that the owners of the latter are liable to those of the former for one half of the damages sustained by her. This, it seems to us, is not a true account of the legal relations of the parties. . . . These authorities conclusively show that according to the general maritime law, in cases of collision occurring by the fault of both parties, the entire damage to both ships is added together in one common mass and equally divided between them, and thereupon arises a liability of one party to pay to the other such sum as is necessary to equalize the burden. This is the rule of mutual liability between the parties."

In *The Chattahoochee*, 173 U. S. 540, which was also a collision occasioned by the mutual fault of a steamer and a schooner, followed by a total loss of the latter, the survivor was permitted to deduct from one half of the damages recovered for the loss of the vessel one half of the value of the cargo of the latter, notwithstanding the total loss of the schooner, and the fact that under the Harter act she would not have been liable to the owner of the cargo for negligence in navigation. We held in that case that the sunken vessel was not entitled to the benefit of any statute tending to lessen its liability to the other vessel, or to an increase of the burden of such other vessel, until the amount of such liability had been fixed upon the principle of an equal division of damages.

The case under consideration is distinguishable from this only in the fact that the intervening libels are for loss of life, for which no lien is given upon the vessel in the absence of a local law to that effect, while in the case of *The Chattahoochee* the libel sought to recover for the loss of the cargo, for which a lien was given by the law maritime upon the vessels in fault.

Assuming for the present that the question of lien is material, we are next to inquire whether such lien is given by the local law of Louisiana. We are cited in this connection to two articles of the Civil Code, the first of which, Art. 2315, as amended in 1884, declares that " every act whatever of man that causes damages to another, obliges him by whose fault it happened to repair it ; the right of this action shall survive, in

case of death, in favor of the minor children or widow of the deceased, or either of them, and in default of these, in favor of the surviving father and mother, or either of them, for the space of one year from the death. The survivors above mentioned may also recover the damages sustained by them by the death of the parent, or child, or husband, or wife, as the case may be."

It was held by us in *The Corsair*, 145 U. S. 335, a case arising out of a collision which also took place on the lower Mississippi, that this local law did not give a lien or privilege upon the vessel, and that nothing more was contemplated by it than an ordinary action according to the course of the law as administered in Louisiana.

Our attention is also called by the owners of the Dumois to subdivision 12 of Art. 3237 of the Civil Code, which reads as follows: " Where any loss or damage has been caused to the person or property of any individual by any carelessness, neglect or want of skill in the direction or management of any steamboat, barge, flatboat, water craft or raft, the party injured shall have a privilege to rank after the privileges above specified." No reliance was placed upon this article in the case of *The Corsair*, probably because it was thought to refer only to losses or damages to persons still living, and that an action would lie in favor of the party injured. Certainly, if this article had been supposed to give a remedy for damages occasioned by death, to the representatives of the deceased person, it would never have escaped the attention of the astute counsel who participated in that case.

The question whether " damage done by any ship," jurisdiction over which was given to the High Court of Admiralty in England, included actions brought by the personal representatives of seamen or passengers killed in a collision, has been the subject of many and conflicting judicial opinions in the English courts, a summary of which may be found in *The Corsair*, 145 U. S. 345, and was finally settled against the jurisdiction by the House of Lords in the case of *The Franconia*, 10 App. Cases, 59.

In this country the law is so well settled that by the common

law no civil action lies for an injury resulting in death, that we need only refer to the case of *Insurance Co.* v. *Brame*, 95 U. S. 754, and to the same doctrine applied in admiralty in the case of *The Harrisburg*, 119 U. S. 199. The object of Article 3237 was not to extend the cases in which damages might be recovered to such as resulted in death, but merely to provide that, in cases of damages to person or property, where such damage was occasioned by negligence in the management of any water craft, the party injured should have a privilege or lien upon such craft. We deem it entirely clear that the article was not intended to apply to cases brought by the representatives of a deceased person for damages resulting in death.

But it does not necessarily follow that because there is no lien there can be no deduction of a moiety of these damages from the sum awarded to the Argo. Neither the case of *The North Star* nor that of *The Chattahoochee* is put upon the ground of a lien, since in both cases the vessel against which the deductions were made were totally lost by the collision, and in *The Chattahoochee* the provisions of the Harter act would have exonerated her, even if no total loss had occurred. But no extended discussion of this is necessary, since the question is settled by the case of *Butler* v. *Boston and Savannah Steamship Co.*, 130 U. S. 527, in which it was unanimously held that the limited liability act applied to cases of personal injury and death, as well as to those of loss of, or injury to, property. This was an independent libel *in personam* against the steamship company to recover damages for death, and the company pleaded in defence certain proceedings in a case of limited liability instituted by it and then pending. There was a statute of Massachusetts relied upon, which gave a personal remedy but no lien upon the vessel. The loss occurred within the jurisdiction of that State. The single question presented was whether the limited liability act applied to damages for personal injury and loss of life, and thus deprived those entitled to damages of the right to entertain suit for recovery, provided the ship owner had taken appropriate proceedings to limit his liability. The court, after a careful examination of the law of limited liability of ship owners, had no difficulty

in reaching the conclusion that it covered the case of injuries to persons as well as that of injury to goods and merchandise, and that these proceedings were a good defense to the libel.

It follows that the claims of the intervening libellants, Mrs. Blesine and Mrs. Hester, were valid claims under the limited liability act, notwithstanding that there was no lien under the local law, and that there was no error in deducting a moiety of these claims from the amount awarded Springer.

Upon the whole case we are of opinion that the decree of the Circuit Court of Appeals was right, and it is therefore, as to both cases,

*Affirmed.*

THE CHIEF JUSTICE and MR. JUSTICE PECKHAM dissented.