### THE SAN SIMEON.
### THE COMMERCIAL MARINER.

**GENERAL CABLE CORPORATION et al. v. PACIFIC ATLANTIC S. S. CO. et al.**

No. 238.

Circuit Court of Appeals, Second Circuit.

March 13, 1933.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for Commercial Mariner.

McFarland, Taylor & Costello, of New York City (Willard U. Taylor and Ernest A. Fintel, both of New York City, of counsel), for San Simeon.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson, D. Roger Englar, and Oscar R. Houston, all of New York City, of counsel), for Cargo of Commercial Mariner.

Howard M. Long, of Philadelphia, Pa., and Leah H. Neuer, of Brooklyn, N. Y., for Levey, administratrix.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

These appeals raise the merits of a collision between the steamers "Commercial Mariner" and "San Simeon" in the Delaware river on the night of January 22, 1931. The owner of each vessel filed a petition to limit its liability, which was allowed, and the right to which is not disputed. The issues arise as to the claims which were filed against the owner of the San Simeon, the Commercial Mariner having been sunk, and being a

total loss. There is also an issue as to the amount of the San Simeon's pending freight.

The facts are in brief as follows: The dredged channel of the Delaware River at the locus in quo is seven hundred and fifty feet wide; coming south from Wilmington there is a straight reach of about four miles, known as the Cherry Island Range, about S. S. W. ½ S. The channel then turns twenty-six degrees west at a flashing buoy on the west side, and enters another reach, the Deepwater Point Range. The western corner of the angle between the two reaches has been dredged out so that a descending steamer may cut across it. The dredged depth is about six fathoms; to the westward of the channel below the buoy the depth is about four fathoms. The Commercial Mariner was the outward bound ship; she was 251 feet long, 43 feet abeam, with a draught of 21 feet; she was passing over the ground at eleven knots on an ebb of about one to one and a half. The San Simeon was inward bound; she was 412 feet long, 54 feet abeam; her speed over the ground was nine knots. The San Simeon struck the Commercial Mariner on her port side at her engine room, about amidships, making a wide gash which instantly flooded that compartment. She also broke through the bulkhead between the the engine-room and the after hold, but this rent was much smaller. The water flooded the after hold and sank the Commercial Mariner by the stern, at the western edge of the channel and practically parallel with it. Her bows were about one thousand feet below the buoy. Many witnesses testified to the angle of collision; their estimates were from sixty to seventy-five degrees, and in its "agreed statement" under Admiralty Rule 42 (13), of the District Court, the Commercial Mariner gave the angle as seventy-five.

The versions of the two steamers are, as usual, discordant. The Commercial Mariner says that she was coming down the Cherry Island reach at full speed on the west side. She made out the red light of the San Simeon when the vessels were at least three miles apart, and gave her a single blast when they were about a mile apart. Though she got no answer, she kept on. Some time later, when the vessels were only a quarter of a mile apart, the San Simeon blew two blasts, on which, believing that her safety lay in pressing on and being unable to haul off to starboard, the Commercial Mariner kept her speed with a port helm, and nearly escaped. The San Simeon at once followed her own signal by a hard astarboard helm, and struck her as we have said. At some time before the collision the Commercial Mariner herself gave an alarm; we shall later discuss the testimony as to when this was. As soon as she was struck she gave the order to let go her anchor, but the chain coiled without any lead, showing that she was already aground. The crew had time to leave their quarters except one, who was killed by the blow. The collision was well below the buoy; she sank almost in her tracks. The San Simeon's story is that she was coming up on the east side of the channel, though it does not appear how far she was from its edge. She made out the green light of the Commercial Mariner on the reach above; she was also on the east side of the channel. The San Simeon did not hear the single blast, and saw that she must make over to the west side to pass. After turning the buoy she blew a double blast and at the same moment hard astarboarded, keeping her speed until just before the collision, when she stopped and backed, but too late. After the double blast the Commercial Mariner ported over into the San Simeon's water, gave a single blast and an alarm almost together, and was struck above the buoy.

The judge found that the collision was below the buoy, and we are disposed to agree, though any conclusion is necessarily doubtful. The hole in the wreck was about nine hundred feet below the buoy, and if it be assumed that she kept her speed after being struck, this would allow less than a minute for her to sink, a very short time. But it must be remembered that the blow instantly flooded her engine room and thereafter she had only her own momentum, which would fall off very quickly. If struck at the buoy she might well have taken much more than a minute to cover nine hundred feet. Certain it is that she was ashore when the anchor was dropped, and this should not have taken over a minute; the only witness puts it at half that time. Again she was found parallel with the channel; had she been struck above the buoy she would have turned two points on her own momentum. This seems extremely unlikely, though the action of drifting ships under a helm we do not know. All the witnesses were impressed with the suddenness of her collapse; the only question is, how fast the water could pass through the broken bulkhead.

■ We do not believe that she was on the wrong side of the channel. She had the buoy as a mark, together with some land lights. She had made out the San Simeon much earlier and it would have been ex-

tremely careless to keep to the east side. It would have been worse, after hearing the San Simeon's signal, if she did, to port over into her water. Every probability makes for her being in position. Moreover, there is reason to suppose that the San Simeon had not been duly watchful. Her manœuvre was an emergency one; it would in any case have carried her out of the channel. She might easily place the Commercial Mariner on the wrong side, miscalculating her position because of the bend at the buoy, and the green light. Her belief that the Commercial Mariner later ported across her bows was a natural misunderstanding of her turn at the bend. But whatever the reason, the San Simeon was clearly at fault for undertaking a starboard passing without consent, article 18, rule I. The Dauntless, 3 F.(2d) 529 (C. C. A. 2); The Bilbster, 6 F.(2d) 954 (C. C. A. 2); The Sabine Sun, 33 F.(2d) 42 (C. C. A. 3). If she thought the Commercial Mariner too close aboard to wait, careful navigation required her to sound the alarm and back.

■ We are not so clear as to the fault of the Commercial Mariner, and it might be fair to give her the benefit of the rule that when one vessel is grossly at fault the other's navigation must be viewed with lenity. The Victory (The Plymothian), 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519. But even that will not excuse a plain fault. The Albert Dumois, 177 U. S. 240, 252, 20 S. Ct. 595, 44 L. Ed. 751. The question turns upon the distance apart of the vessels when the San Simeon blew her double blast. As to this we have data which make a reasonable conclusion possible, confirmed by the generally known movements of vessels of the San Simeon's size. She was tried out after the collision in the same waters, and it was found that under a hard astarboard wheel it took her fifty-five seconds to swing the first twenty-five degrees and fourteen or fifteen seconds thereafter for every ten degrees. A turn of seventy degrees would therefore take her about two minutes. This is closely confirmed by the experiments recorded in Admiral Knight's book (Eighth Edition, Plate 113, pp. 326–328). The turning circle of a vessel of the San Simeon's size is there pictured. To turn seventy degrees she must make a "transfer" of nine hundred feet, and an "advance" of fifteen hundred. The speed falls off with the helm till it becomes only sixty per cent. after a turn of eight points. The San Simeon's speed through the water was about ten knots; her average speed on the swing was presumably eight or nine. The curve she travelled was about eighteen hundred feet long; which at nine knots would take her just two minutes. But a "transfer" of nine hundred feet would have carried her out of the channel, even if she had started at the extreme eastern edge; she could hardly have swung so much. If we assume that she was in the middle of her half of the channel, and struck the Commercial Mariner on the western edge, her "transfer" was a little less than six hundred feet, and she had changed her heading (accepting Knight's curve), by fifty-five degrees, measurably supported by her quarter-master's observation. If so, she covered a distance of about sixteen hundred and fifty feet, which at nine knots would take about one and three quarters minutes. Under her own trial manœuvres this time was a minute and forty seconds, almost exactly the same. This seems to us to be the least time between her signal and the collision that the evidence will bear, and it accords moderately well with the testimony as to the angle of collision. Should we assume that the San Simeon was at the very east edge of the channel, the angle can be raised to sixty-five degrees, and the time again becomes nearly two minutes, but the basis for this is rather thin and the difference not very substantial. We shall take the lower estimate as there is no difference in the result. It is thus possible to calculate the distance apart of the vessels when the San Simeon blew her double blast. The Commercial Mariner moving through the water at ten knots was a little less than eighteen hundred feet away from the point of collision; the "advance" of the San Simeon was fourteen hundred feet; they were about thirty-two hundred feet apart, nearly two-thirds of a mile, not a quarter of a mile, as the Commercial Mariner supposed.

■ It seems to us that with every allowance the navigation of the Commercial Mariner will not pass muster. She ought to have blown an alarm as soon as she got the San Simeon's signal (article 18, Rule III, Inspector's Rule I); we are also disposed to think that she ought to have stopped and backed. The testimony bears out the first fault. Her master did indeed say that he blew an alarm at once upon hearing the San Simeon's signal; but he couples this with saying that the San Simeon's signal was given when the vessels were only a quarter of a mile apart, which was certainly not the case. Further he said that he ported at the same time that he gave the alarm, and this

was almost at the moment of collision. The members of the Commercial Mariner's crew emphasize the shortness of the time between the collision and the danger signal; they were nearly at the same moment. It is clear that the alarm was not blown a minute and a half before the collision. The alarm the witnesses were talking about was one given just before the collision; the master naturally put this back to the time of the San Simeon's signal, but in this he was mistaken; there were not two alarms. The Commercial Mariner had probably been inattentive and had not heard the double blast; or had disregarded it. She had only one officer on the bridge and no look-out forward. While we agree that a look-out will not keep reporting a vessel once seen, we are not advised that he would not report a subsequent signal. We hold the Commercial Mariner for failing to answer the double blast with an alarm. As to this fault, it is indeed true that the Commercial Mariner was not in doubt as to the San Simeon's intention, and, reading the rule literally, that is the only occasion for the danger signal. But a fortiori when the proposed navigation is plainly impracticable, the ship should blow. The Bergen (D. C.) 108 F. 555, affirmed 128 F. 920 (C. C. A. 2). It is indeed impossible to say that this would have changed the result, but the fault being a breach of a rule, the Commercial Mariner must satisfy any doubts. Such a signal would have told the San Simeon that the Commercial Mariner thought her navigation dangerous; not being followed by a backing signal it ought to have told her that she was coming on. It is impossible to say what she would have done in this predicament, but it must have appeared to her that the Commercial Mariner did not mean to pass under her stern. It is quite possible that she would have slackened speed, as she did when the situation developed more completely. A very little change would have sufficed; the Commercial Mariner needed only about seven seconds to escape. Such speculations the law throws upon the vessel which fails in her duty. It seems to us enough to charge her.

█ Furthermore, we find it difficult to excuse a master, who, faced with an obviously wrong proposal of another vessel, did not stop and back. He could have killed his way in one thousand feet, and he knew that the San Simeon was falling off to port, and diminishing her speed towards him. If under a hard over helm, she would cut his course in an "advance" of four lengths, and he would be stopped before he reached her. To

be sure, he could not be certain that her helm was hard over, and it would take some time to stop and reverse his own engines. The situation was indeed trying, and allowance must be made for a decision made under pressure. Moreover, it is not always necessary to stop and back. The Hallgrim, 20 F.(2d) 720 (C. C. A. 2); The Sidney M. Hauptman, 34 F.(2d) 622 (C. C. A. 2); The Steel Inventor, 43 F.(2d) 958 (C. C. A. 2). But the rule is ordinarily imperative. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; A. H. Bull S. S. Co. v. U. S., 34 F.(2d) 614 (C. C. A. 2); The Quogue, 47 F.(2d) 873 (C. C. A. 2); The Fulton, 54 F.(2d) 467 (C. C. A. 2). The Albert Dumois, supra (177 U. S. 240, 20 S. Ct. 595, 44 L. Ed. 751), was a very similar case and the Argo, which was in the same position as the Commercial Mariner, was held at fault for keeping on. When the ships are head and head, reduction of speed by one is a safety, even though the other ship does not also slacken. Here indeed there was promise of a wide angle of collision, but if the San Simeon too had backed, as she should have done, had she got an alarm and a backing signal, the blow would likewise be reduced, if not wholly avoided. Moreover, it is essential to any safe navigation that until the contrary appears each ship shall do her part. Though speed will indeed reduce the time during which ships can collide, that is more than made up for by the force of the blow, if they do. The passage relied on from Admiral Knight's book (Eighth Edition, pp. 451, 452), refers to a vessel which turns away from the other, thus crossing all lines of her possible approach. In that case speed is recommended because it lessens the period when her broadside is exposed. But that course was not open to the Commercial Mariner, which could not leave the channel. A properer course perhaps was to starboard, thus presenting her bows to the San Simeon and cutting fewer of her lines of approach; but this manœuvre the claimants do not press, and we should not consider it, though we cannot help thinking that it was the right course. Finally, the fact that backing would have thrown the Commercial Mariner's stem to starboard, was not, in this situation, a danger; as the San Simeon was coming on her port hand, it reduced the width of the target. We do not however find it necessary to put the result upon a failure to stop and back, because the delay in sounding an alarm is enough. We may say, however, that if pressed we should find it troublesome to distinguish The Albert Dumois, supra

802

(177 U. S. 240, 20 S. Ct. 595, 44 L. Ed. 751).

A final point arises as to the pending freight of the San Simeon. It was stipulated that she was on a voyage from Pacific Coast ports to New York and Philadelphia. She had already touched at New York and discharged some of her cargo there, necessarily earning the freight upon it; she was bound up the Delaware with the remainder. The argument is that her "pending freight" cannot include that already earned, but must be limited to what she still had on board. It is indeed curious to speak of freights already earned as still "pending," but that was the effect of the decision in The Main v. Williams, 152 U. S. 122, 14 S. Ct. 486, 38 L. Ed. 381. There the fares of passengers had been prepaid in advance, but were nevertheless treated as pending freight; for, as Mr. Justice Brown observed, page 131, the phrase is used as an equivalent of the "earnings of the voyage." Cf. In re Hedger Co., 59 F. (2d) 982 (C. C. A. 2). The San Simeon has examined the record in that case, and professes to have found that the freight surrendered did not include part of the cargo which had been already discharged. We are not however concerned with a point not considered; the practice of searching records and extracting as a part of the decision what the court did not mean to hold, may be useful as an academic exercise, but it is otherwise idle.

Decree affirmed.