## ULSTER OIL TRANSPORT CORP.
### v.
### THE MATTON NO. 20.
### THE PETROLEUM NO. 7.
### THE CARUTICA.

No. 18, Docket 22726.

United States Court of Appeals, Second Circuit.

Argued Dec. 10, 1953.

Decided Jan. 25, 1954.

Mahar & Mason, New York City (Frank C. Mason, New York City, of counsel), for claimant-appellant.

Galli & Locker, New York City (Warner Pyne, and Vincent J. Ryan, Babylon, N. Y., of counsel), for claimant-appellee Motor Vessel Carutica.

Macklin, Speer, Hanan & McKernan, New York City (Martin J. McHugh, New York City, of counsel), for libellants-appellees.

Before CHASE, Chief Judge, and L. HAND and MEDINA, Circuit Judges.

MEDINA, Circuit Judge.

Shortly after 9:00 o'clock in the evening of October 4, 1947, a collision occurred in the Mohawk River section of the New York State Barge Canal about one mile west of Lock 12, between the Motor Vessel "Carutica" and the barge "Petroleum No. 7," which the tug "Matton No. 20" had in tow pushboat fashion. The weather was clear, there was no wind or current to speak of, the visibility was good and all required lights were burning and in good order on each vessel. The "Carutica," 296.9 feet in length,

with a beam of 43½ feet, was a grain carrier consisting of three separate units fastened together to make a rigid vessel, the after section being a power unit where the engines, pilot house and crew's quarters were located. The "Petroleum No. 7" was a tank barge 200 feet long, with a beam of 40½ feet, attached by cables to the stem of the "Matton No. 20," 77.8 feet in length with a beam of 20 feet, an over-all length of 277.8 feet. The "Carutica" was eastbound and the tug and barge were westbound as each approached a sharp bend in the river, the peak or apex of which was about midway between two red-lighted buoys numbered 258 and 260, where the channel was 300 feet wide. The collision occurred between buoy 258 and buoy 260 abreast of buoy 251.

The fault of the "Carutica" being established beyond doubt, as she was beyond her own side of the channel when the vessels made contact, the question before us is whether both vessels were to blame or only the "Carutica."

As there was no lookout on either the "Petroleum No. 7" or the "Matton No. 20," the trial judge proceeded to determine whether it was clear from the proofs that the absence of such lookout neither did, nor could have contributed to cause the collision. Gulf Oil Corporation v. The Socony No. 16, 2 Cir., 1947, 162 F.2d 869. Applying this well settled test he found that the "Matton No. 20" had not sustained the heavy burden thus imposed upon her by her violation of this statutory duty. We think this ruling was right; and, in addition, we find affirmatively that the "Matton No. 20" was at fault, because no bend signal was given and because, when the danger of collision was apparent, the captain of the "Matton No. 20" failed to stop and reverse his engines, which, under the circumstances hereafter described, would have killed off her headway and brought her dead in the water in time to avoid the collision, as she was proceeding at only half speed or about 1½ miles per hour.

At the time the vessels sighted each other the "Carutica" was making about two miles an hour and the "Matton No. 20," as already stated, in the neighborhood of one and one-half, both proceeding at half-speed. A glance at the Chart, Matton Exhibit No. 1, will indicate that each should have given one long blast of the steam whistle, as required by Inland Rule, Article 18, rule V, 33 U.S.C.A. § 203, and Pilot Rule 80.5 when each was within half a mile of the bend, as the circumstances were such that the trial judge found that the respective units first observed each other at about a distance of 800 feet, the bend signal being required if an approaching vessel cannot be seen from a distance of half a mile. Captain Roberts of the "Matton No. 20" testified that he sounded no bend signal, and it is unlikely that any was given by the "Carutica," as the testimony is conflicting and the trial judge makes no finding that either vessel gave the one long blast required by the Rules. Had this been done it is highly improbable that the "Carutica," thus timely warned of the approach of the "Matton No. 20," would have tried to cut the bend as she subsequently did. Even the testimony of Captain Wimette, which was in the main rejected by the trial judge, places the "Carutica" abeam of buoy No. 253 when he claimed first to have observed the "Matton No. 20" and he would have been as far back as between buoys 255 and 257 at the time of the "Matton No. 20's" bend signal, had it been given when it should have been given. This would have given warning to the "Carutica" whilst still in a position where she would not yet have had any occasion to leave mid-channel. The very purpose of the requirement of a bend signal is to warn approaching vessels sufficiently in advance to prevent a change of course such as the one made by the "Carutica" and presently to be described.

From the speed of the respective vessels it is likely that, had the bend signals, or either of them, been given when required by law, a port to port passing

would readily have been negotiated, despite the narrowness of the channel and the bulk of the approaching vessels.

Accordingly, each, without knowledge of the proximity of the other, made headway toward the bend. The "Matton No. 20" had a hard starboard rudder to make the starboard bend when Captain Roberts first sighted the "Carutica." He was close to the edge of the channel to starboard, the finding of the trial judge being that at the time of the collision the "middle of the bow" of the "Petroleum No. 7" was but 30 to 40 feet from the red-lighted buoy No. 260 on the "Matton No. 20's" side of the channel. The distance between the approaching vessels when Roberts sighted the "Carutica" is estimated by him as about 800 feet; only the red and white lights were visible; and Captain Roberts anticipated no danger. There was an exchange of a single short blast and a port to port passage thus agreed upon, Captain Roberts responding to this signal from the "Carutica."

The course taken by the "Carutica," just immediately prior to the time the vessels hove in sight of one another, must have been a gradual curving course to port, designed to cut the bend. It is impossible to tell precisely when her two main engines, connected with a single driving shaft and wheel, were stopped and reversed, but the probability is. that it was not later than the time when she was first sighted by Captain Roberts. The steering of the "Carutica" was by a separate propeller connected with a third engine, and this was shifted to throw a jet of water in the direction opposite to the one it was desired the vessel should take. When the main engines were stopped and then put in reverse, the steering propeller was shifted so as to throw the jet of water to port, in an endeavor to change the course to starboard. But this maneuver could scarcely accomplish its purpose at once, and we may infer that for a time the "Carutica" continued in her course of turning gradually to port.

Thus it was that at what is one of the crucial points of the case, the "Carutica's" green broke to the view of Captain Roberts, who at once realized that there was danger of collision. The position of the two vessels at that time was found by the trial judge to be "about 500 feet apart." We cannot say that he was wrong. There was ample basis for his failure to adopt Captain Roberts' estimate that the distance was then only 150 to 200 feet.

But, if the vessels were thus 500 feet apart when Captain Roberts first anticipated trouble, his testimony that he could have stopped and reversed his engines and brought his tug and tow dead in the water in about two lengths or around 400 feet, not only compels an application of the lookout rule as found by the trial judge, but, in our view, establishes further affirmative fault on the part of the "Matton No. 20."

Had a lookout been stationed on the bow of the "Petroleum No. 7," it cannot be doubted that the "Carutica" would have been sighted at a distance of considerably more than 800 feet and her starboard running light would have been visible to the lookout not when the vessels were 500 feet apart, but when they were apart a distance of perhaps 700 feet or thereabouts, thus giving more than ample room for a stopping and reversing operation, which would have avoided the collision, as the "Carutica" seems to have lost all headway and was only being pushed by the steering propeller into the cater-cornered position indicated in Matton Exhibit B, when the vessels came together. Moreover, if the absence of the lookout be left out of consideration, we must take it as a fact that Captain Roberts was aware that a collision might occur, when the vessels were 500 feet apart, and we think under the circumstances he should have stopped and reversed.

Instead of stopping and reversing Captain Roberts admits that he continued on as before, in the hope that the vessels would just slide past one another

without damage to either. This was more than an error of judgment in an emergency.

We agree with the trial judge that a danger signal would not have had any bearing on the course of events.

Affirmed.

L. HAND, Circuit Judge (dissenting).

The "Matton No. 20" is of course chargeable with the statutory fault of failing to blow a bend whistle; and she is equally chargeable with not having a lookout stationed where he should be, a fault which we have twice held is to be regarded as the equivalent of a statutory fault.[1] On the other hand, the "Carutica" was guilty of the most unpardonable navigation, whether, as seems to me most probable, she was merely cutting close to the north shore to make an easier turn around the bend, or was guilty of the strange navigation attributed to her in the findings. If her fault was the first, I should not be willing to say that the failure of the "Matton No. 20" to blow a bend whistle could have had nothing to do with the collision. If the "Carutica" had heard such a whistle, it is not certain that she would not have pulled over to her starboard and given the oncoming "Matton No. 20" a fair berth. The doctrine of The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84, and The Victory and The Plymothian, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519, would not in that event have protected the "Matton No. 20"; for, although that doctrine does hold that, when one of two vessels in collision has been guilty of very grave fault, the other should not be held at fault except upon "clear and convincing" proof, once the fault of the other is proved, apparently the doctrine is *functus officio*, and if the fault be "statutory," the usual rule still applies that the guilty ship must show that the fault could not have contributed to the collision.[2] I should have doubt whether the absence of the lookout on the "Petroleum No. 7" should also be counted, for it is hard to believe that even had he been in position, he would have seen the "Carutica" enough earlier than Roberts to make a difference. However, it would be unnecessary to decide that question, because the failure to blow the bend whistle would alone have charged the "Matton No. 20."

But all of this is beside the point, if we accept the findings, for these ascribe to the "Carutica" the following amazing navigation. The two vessels first made each other out, when they were 800 feet apart, which, at a mutual approach of about four miles an hour, means that they were about two and a half minutes away from each other at unslacked speed. The "Carutica" was then "in about the center of the buoyed channel," and after the vessels had exchanged passing signals, "her main engines were stopped and her captain started to swing her to starboard." Obviously, if that had been all she did, she could never have gone to port, because backing on her main engine did not throw her bow to port or starboard. How then did she collide with the tow of the "Matton No. 20," when the bow of that tow was only 20 feet from the channel boundary? So far as I can see, she could have got herself in that posture only as follows. About a minute after the vessels saw each other, *i. e.* when they were presumably 400 feet apart (though Roberts thought in about half that distance), "the 'Carutica' opened up with its green light to the 'Matton No. 20.'" It is obviously impossible to account for this, unless the "Carutica" turned to port early enough to bring her tow from "about the center of the buoyed channel" to within sixty feet or so of its north boundary, where the collision occurred. If that is a true account of what happened, it

1. The Anna W., 2 Cir., 201 F. 58; Gulf Oil Corporation v. Socony No. 16, 2 Cir., 162 F.2d 869.

2. The San Simeon, 2 Cir., 63 F.2d 798, 801; General Seafoods Corp. v. J. S. Packard Dredging Co., 1 Cir., 120 F.2d 117, 120; Lind v. United States, 2 Cir., 156 F.2d 231, 233.

seems to me that the "Matton No. 20" did show beyond doubt that her failure to blow a bend whistle could have had nothing to do with the collision; and that she therefore satisfied the rule of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148. Certainly when a vessel veers from an agreed passing, port to port, and at a distance of 400—to say nothing of 200—swings across the bows of the other, the absence of a bend whistle five or six minutes before cannot have contributed an iota to the collision. So too of the absence of a lookout on the bows of the "Petroleum No. 7." There remains the putative fault of the "Matton No. 20" in not backing, and in trying to scrape through what water the "Carutica" had left of the channel. That was not a statutory fault in any event; and as to it the doctrine of the City of New York, supra, 147 U.S. 72, 13 S.Ct. 211, does apply; and it ought to clear the "Matton No. 20." For, again, consider the occasion. When the "Carutica" "opened up" her green light, the "Matton No. 20" must have understood it for what it was: a swing towards her and into her water. Was it plainly bad navigation, faced with such a preposterous and unanticipated manoeuvre, to think it a better chance to try to slide past rather than to stop dead in what apparently might be the path of the oncomer? I submit that that is precisely the situation that the doctrine was intended to meet, and that it exonerated the "Matton No. 20."

Therefore, the appeal seems to me to turn upon whether one should accept the findings that impute to the "Carutica" the uncanny antic I have described; or whether one should substitute what seems to me the more likely version of what happened. I feel in some doubt; but, after all, I was not at the trial, and I do not believe that I ought to refuse to go along with the findings of the experienced judge who made them, supported as they are by the testimony of witnesses whom he heard and saw.

Therefore, I think that the "Matton No. 20" should be exonerated, and that the "Carutica" should pay the whole bill. Is it out of place to point out that the suit is one more illustration of our strange obstinacy in clinging to the division of damages and refusing to apportion them? This has become even more egregious, when we reflect that, where personal injuries are in issue, we do follow the more enlightened doctrine, now in force in most countries.[3]

---

3. The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586; Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202.