## WHITE v. JOHN W. COWPER CO., Inc.

(Circuit Court of Appeals, Second Circuit. February 9, 1921.)

### No. 140.

**1. Admiralty ⊜18—Has jurisdiction of action for tort on navigable waters.**

Admiralty has jurisdiction of a suit to recover damages for a maritime tort that occurs on the high seas or public navigable water, whether it be a wrongful act or a wrongful omission.

**2. Admiralty ⊜21—May enforce remedy for wrongful death given by state statute.**

In the absence of a federal or state statute giving a right of action therefor, a suit in admiralty cannot be maintained to recover damages for death caused by wrongful act or negligence on the high seas or navigable waters; but such a right of action given by a state statute is enforceable in the admiralty courts, if the facts are such as would bring the case within the maritime jurisdiction, if death had not resulted.

**3. Master and servant ⊜120—General rules apply to employment on vessels.**

Persons employing labor on or about vessels are bound to the same rule of care in regard to furnishing their servants with reasonably safe appliances and places for work as other masters, and are liable for injuries caused by negligence in this respect.

**4. Master and servant ⊜129(1)—Drowning of laborer using gangplank for unloading scow held due to employer's negligence.**

Libelant's intestate, with others, was employed by respondent in unloading sand from a scow on the Erie Canal. The scow was some distance from the bank, and the sand was taken in wheelbarrows from the scow over a gangplank 16 feet long to another boat, and from there to the shore. The gangplank was not sufficiently stiffened to prevent it from springing when a load was carried over it, and as the scow was unloaded it rose in the water until the outer end of the plank was some 4½ feet higher than the other end, and in wheeling a load down it libelant's intestate, who was a small man and inexperienced, was unable to hold back the barrow, and was thrown off the plank and drowned. *Held,* that the cause of the death was the unsafe condition of the place where the work was done, resulting from the improper construction of the gangplank and the changing of its position as the work progressed, which unsafe condition was attributable to respondent's negligence.

**5. Master and servant ⊜218(4)—Obvious risk not assumed by inexperienced servant.**

Although a defect is apparent, the servant may not realize the hazard caused thereby, especially where he is without previous experience in the work, and in such case the risk is not assumed.

Appeal from the District Court of the United States for the Western District of New York.

Suit in admiralty by Charles A. White, administrator of the estate of Calogero Falzone, deceased, against the John W. Cowper Company, Incorporated. Decree for libelant, and respondent appeals. Affirmed.

For opinion below, see 260 Fed. 350.

Ulysses S. Thomas, of Buffalo, N. Y. (Ralph W. Dox, of Buffalo, N. Y., of counsel), for appellant.

Lanza, Bell & Montesano, of Buffalo, N. Y., for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is a suit to recover damages for the death of the administrator's intestate, Calogero Falzone, whose death

it is alleged was due to the negligence of the respondent. Falzone was on May 24, 1916, and for some time prior thereto, in the employment of the respondent as a laborer assisting in the construction of a building along the Erie Canal, in the city of Buffalo. While so engaged he was required to and did haul, by means of a wheelbarrow, sand or gravel from a scow on the canal to the building then under construction. The sand scow was heavily loaded, and was so low in the water that it was impossible to get it close to the shore. To remedy this situation another boat was anchored between the sand scow and the shore. There was a space of about 12 feet between the sand scow and the smaller inside boat and the shore. It does not appear what the exact distance was between the inside boat and the shore. The testimony was that the inside or construction boat was not right up against the dock on account of the mud and dirt. There appears to have been no sufficient wharf or dock over which the sand could be conveniently unloaded, and gangplanks were laid from the sand scow to the inside boat, and from the inside boat to the shore. On the morning of the accident, May 24, 1916, the two boats were about on a level.

The deceased was set to work with a gang of about 30 others rolling sand in wheelbarrows from the outside sand scow to the inside boat, and thence over other gang planks to the shore. By half past 1 in the afternoon, which was the time the accident happened, the sand scow was more than half unloaded. As the sand was unloaded, the outside boat rose out of the water. About noon heavy pile-driving machinery was loaded upon the inside boat, which caused it to settle in the water. This caused the gangplank, which ran from the inside boat to the outside boat, and which was level with the boats when the work began at 7 o'clock, to become quite uneven. There is disagreement in the testimony as to the extent of the gangplank's incline. The libelant's witnesses put it at between 6 and 7 feet, while the respondent's witnesses state the difference as about 2½ feet. The District Judge thought it not unlikely that the difference was approximately 4½ feet. The gangplank was about 16 feet long and 6 feet and 10 inches wide. It consisted of three planks put close together. They had a 2x6 cleat on the underside to hold them together. They were very springy, and given to an up and down motion when any of the men rolled their loads of sand over them. There were no guard rails, nor was there any stiffening of the gang plank by means of lengthwise timbers. It is agreed that it is not customary to have railings or guards along a gang plank over which merchandise is hauled, although such a custom does exist as respects gangways used for passengers. The deceased's work consisted in wheeling an iron wheelbarrow filled with sand down the gangplank. The following is an excerpt from the testimony of one of the men employed with the deceased upon this work:

"Q. What effect did the change in grade of the gangplank have upon you as you rolled your wheelbarrow of sand across it? A. The effect was that one side of the plank was higher and the other side low, and it ran faster. The wheelbarrow ran faster because it was deeper—steeper. The wheelbarrow had the effect of pulling the person rolling it along.

"Q. And rolling the wheelbarrow over that plank—Describe what the con-

dition of the plank was, as to rigidity or elasticity. A. If you are strong enough to hold the wheelbarrow, it is all right; but if you are not strong enough, it would pull you along. That plank, as I rolled across it, was springing."

The deceased was a young Italian laborer 25 years of age, rather short of stature and slim of body. He was described by one of his co-workers as "very skinny, and much smaller than the others on the job." At the time of the accident he was engaged in rolling a wheelbarrow of sand down the steep incline of this springy gangplank, and he lost control of the wheelbarrow, and fell over into the water, and was drowned.

The respondent owned no boats. Its business was the construction of buildings. The work of unloading this boat was done under the supervision of a foreman, who was without experience in the unloading of boats. The unloading of the scow in this case was the one only job of the kind he had ever had.

[1] The foregoing are the facts as they appear to us in the record. It remains to state the law applicable thereto. In cases of tort, the jurisdiction in admiralty depends entirely on locality, and it is now settled that the admiralty has jurisdiction of a suit to recover damages for a maritime tort that occurs on the high seas or public navigable water, whether it be a wrongful act or a wrongful omission. Atlantic Transport Co. v. Imbrovek, 234 U. S. 52, 34 Sup. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157; Southern Pacific Co. v. Jensen, 244 U. S. 205, 37 Sup. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900. In the first of the above cases it was held that the admiralty has jurisdiction of a suit in personam by an employee of a stevedore against the employer to recover for injuries sustained through the negligence of the latter while engaged in loading a vessel lying at the dock in navigable waters. In the present case the libel is filed to recover for the death of one who was at the time of his death engaged in unloading a boat under the control of the respondent while lying in the navigable waters of the Erie Canal. In The Robert W. Parsons, 191 U. S. 17, 24 Sup. Ct. 8, 48 L. Ed. 73, the court held that, although the Erie Canal is wholly within the state of New York, it connects navigable waters and is a highway of commerce between ports in different states and foreign countries, and is therefore a navigable water of the United States, within the admiralty jurisdiction of the courts of the United States.

[2] In the absence of a federal or a state statute giving a right of action therefor, a suit in admiralty cannot be maintained to recover damages for death caused by wrongful act or negligence on the high seas or navigable waters. The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358; The Albert Dumois, 177 U. S. 240, 258, 259, 20 Sup. Ct. 595, 44 L. Ed. 751. But such a statute exists in the state of New York, and a right of action so given is enforceable in the admiralty courts of the United States, if the facts are such as would bring the case within the maritime jurisdiction if death had not resulted. See La Bourgogne, 210 U.S. 96, 28 Sup. Ct. 664, 52 L. Ed. 973; The Hamilton,

207 U. S. 398, 28 Sup. Ct. 133, 52 L. Ed. 264; The City of Norwalk (D. C.) 55 Fed. 98.

The principal question which this suit presents is not, however, whether in the unloading of the sand scow the deceased was engaged in work of a maritime nature. The serious question is whether he was furnished by the respondent with a safe place in which to work. It is the duty of the master to furnish the servant with reasonably safe instrumentalities wherewith and places wherein to do his work. Armour v. Hahn, 111 U. S. 313, 4 Sup. Ct. 433, 28 L. Ed. 440. This duty is a positive obligation resting upon the master, and he cannot relieve himself from liability by showing that he had delegated to another the responsibility of its performance. Texas, etc., R. Co. v. Barrett, 166 U. S. 617, 17 Sup. Ct. 707, 41 L. Ed. 1136.

[3] Where a master furnishes or causes to be built under his direction and control a platform, scaffold, staging, or like structure for the use of his servants in the prosecution of their work, it is his duty to see that it is reasonably safe for the purpose for which it is intended to be used. Beattie v. Edge Moor Bridge Works (C. C.) 109 Fed. 233. And persons employing labor on or about vessels are bound to the same rule of care in regard to furnishing their servants with reasonably safe appliances and places for work as other masters, and are held liable for injuries caused by negligence in this respect. The Westport (D. C.) 131 Fed. 815. The failure to exercise for the protection of another the degree of care which the circumstances justly demand whereby injury results is negligence within the meaning of the law. The care required must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated from the neglect. Dexter v. McCready, 54 Conn. 171, 5 Atl. 855.

[4] In view of the above principles we think the respondent failed to exercise the degree of care which the circumstances required. It did not furnish the decedent with a suitable place in which to do the work at which he was put, or reasonably safe appliances with which to do it. The gangplank was improperly constructed, the cleat on the underside being insufficient to hold the planks together and to prevent their springing. It was an imperfect appliance to begin with, and as the work progressed it became a dangerous one, owing to the incline. A strong and experienced man might perhaps do the work without any great peril to his life. But the deceased was inexperienced in unloading a sand barge over a gangplank extending from one boat to another at a considerable distance apart and at a very considerable incline. As the respondent undertook to unload the gravel boat, not in the usual manner of unloading from the boat to the dock, but in the unusual way of unloading from the boat over an inclined and springy gangplank, 16 feet in length, to a scow, and from the scow to the shore, under a superintendent devoid of experience in such matters, who directed an inexperienced man to wheel an iron wheelbarrow filled with sand along the dangerous gangplank, from which he was precipitated to his death without his fault, it must answer therefor.

It cannot be said that the deceased had assumed the risk of what hap-

pened. When he accepted his employment to unload the boat, he assumed all the ordinary and usual risks and perils incident to such work. But the danger to which he was subsequently exposed was not one of the ordinary and usual risks incident to such work, but was due to the exceptional conditions which subsequently developed, and to the negligence of the master in the improper construction of the gangplank. As was said in Gila Valley Railroad Co. v. Hall, 232 U. S. 94, 34 Sup. Ct. 229, 58 L. Ed. 521:

"An employee assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence. But the employee has a right to assume that his employer has exercised proper care with respect to providing a safe place of work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it. Moreover, in order to charge an employee with the assumption of a risk attributable to a defect due to the employer's negligence, it must appear not only that he knew (or is presumed to have known) of the defect, but that he knew it endangered his safety, or else such danger must have been so obvious that an ordinarily prudent person under the circumstances would have appreciated it."

Again, in Chesapeake & Ohio R. Co. v. De Atley, 241 U. S. 310, 314, 36 Sup. Ct. 564, 566 (60 L. Ed. 1016), the court said:

"According to our decision, the settled rule is, not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them."

[5] The deceased was an inexperienced man, and we cannot say that the condition was so obviously dangerous that he must have known and appreciated its danger. The conditions under which he worked in the hours of the forenoon had changed when he went to his work after lunch, and after the pile driver had been placed on the construction boat, and it seems probable to us that in the light of his inexperience he was not fully aware of the risk he was running, and that he was in extreme peril of going off the gangplank, unless he had sufficient strength to keep his wheelbarrow on the gangplank, notwithstanding its incline and its treacherous oscillation. Although a defect is apparent, the servant may not realize the hazard caused thereby, especially in a case where he is without previous experience in his work, and in such a case the risk is not assumed. Fitzwater v. Warren, 206 N. Y. 355, 358, 99 N. E. 1042, 42 L. R. A. (N. S.) 1229.

In what has been said we have not been unmindful of the principle that a master's liability does not extend to a case in which the place to work is made unsafe as the necessary and unavoidable consequence of the work which the servant is employed to do. This case does not belong to that class of cases. The springiness of the gangplank was not a necessary consequence of the progress of the work, but is attributable

to the faulty and imperfect construction of the appliance. The dangerous incline of the gangplank is attributable more to the loading of a large and heavy pile driver upon the deck of the construction boat than to the unloading of the sand boat. If the mere unloading of the sand from the scow disturbed the original level of the gangplank, the duty rested on the master to see that it was kept substantially level by the use of blocks or in some other way. It would have been an easy and simple matter to have kept it leveled up. The superintendent of the work on his cross-examination testified as follows:

"Q. Is there any reason that you couldn't build some blocks, or build a trestle to hold the lower end of that gangway, so that it could be substantially level when the two boats changed levels? A. No, sir.

"Q. No reason that you couldn't do it? A. It couldn't be done, because the other fellow was working in there—we all had to work. The fellows loading the pile driver had to work.

"Q. And that was the reason that you couldn't do it? A. No, sir; it couldn't be done anyway. We could not build a trestle under the low end of the gangplanks. During the noon time I was eating around on the job somewhere. I was not on the boat."

The failure to keep the gangplank level with the boats is not to be excused because "the fellows loading the pile driver had to work," or because the superintendent during the noontime "was eating around on the job somewhere."

Decree affirmed.