**SINCLAIR REFINING COMPANY, as charterer in possession of THE P. W. THIRTLE, Libellant,**

v.

**THE MORANIA DOLPHIN, her machinery, etc., Dolphin Transportation Co., Inc., and Morania Oil Tanker Corp., Claimant-Respondents,**

and

**THE DALZELLEADER and EDNA M. MATTON, Dalzelleader, Inc. and Dalzell Towing Company, Inc., Claimant-Respondents-Impleaded.**

United States District Court
S. D. New York.
Jan. 26, 1959.

See also, 158 F.Supp. 352.

Burlingham, Hupper & Kennedy, New York City, Stanley R. Wright, New York City, of counsel, for libellant.

C. John Dirosse, New York City, for claimant-respondents, Dolphin Transp. Co., Inc., and Morania Oil Tanker Corp.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, Henry C. Eidenbach, New York City, of counsel, for claimant-respondent-impleaded, The Dalzelleader, Dalzelleader, Inc., and Dalzell Towing Co.

Mahar & Mason, New York City, Frank C. Mason, New York City, of counsel, for claimant-respondent-impleaded, The Edna M. Matton, Matton Steamboat Co., Inc.

WEINFELD, District Judge.

The P. W. Thirtle, a super tanker, heavily laden with 200,000 barrels of petroleum products, was proceeding on New Year's Day, 1956 in Kill Van Kull, destined for Tremley Point, New Jersey. She was accompanied by the Tug Edna M. Matton on the starboard side forward and by the Tug Dalzelleader on the port side forward.

While proceeding westerly in the area of Howland Hook, the Thirtle, with Harbor Pilot Graham in control, sounded four blasts, the signal for the B. & O. Bridge, located about a mile down the channel, to open. While awaiting the opening of the bridge, the Thirtle's engines were reduced from "Half" speed to "Slow" at 0903, and put at "Stop" at 0904. The tugs were in neutral position awaiting Pilot's orders.

At about this point there is a 40° turn to port toward Elizabethport Reach which leads to the B. & O. Bridge. The Thirtle was then abeam a recreation pier on the starboard side (the Jersey side), starting to make a gradual swing to port to follow the natural course of the channel toward Elizabethport Reach. She was proceeding at 2½ to 3 knots. The recreation pier is approximately 600 feet easterly from the Bethlehem dock. Right after the "Stop" bell the Thirtle was caught by the flood current on the port bow and lost steerageway.

Almost at the moment when the Thirtle signalled the bridge to open, the Morania Dolphin, a tanker 212 feet in length, which was following astern, began to overtake and pass the Thirtle be-

tween her starboard side and the New Jersey shore.

The Dolphin was proceeding at 6 to 8 knots. While the Captain of the Dolphin claims he gave a passing signal, none was heard by anyone on the Thirtle's bridge. All witnesses are in agreement that no assenting signal was returned. The Dolphin undertook to pass just as the Thirtle was taking the bend. The latter was near the center of the channel, and the Dolphin, when passing the recreation pier, was about 50 feet to the starboard of the Thirtle's starboard tug and about 50 to 75 feet off the pier. Both vessels were heading westerly in a parallel course preparatory to shifting to port toward Elizabethport Reach in the direction of the B. & O. Bridge.

As the vessels continued, the Dolphin, proceeding at a faster rate than the Thirtle, passed the Thirtle which, losing steerage from just about the time the Dolphin commenced to overtake her, continued to fall off to starboard in the direction of the Bethlehem pier.

When the stern of the Dolphin was clear of the Thirtle's bow, the Dolphin was 50 feet off the Bethlehem dock, heading toward it. In order to follow the bend of the channel, she had to swing to port to avoid hitting the Bethlehem dock or going aground; in so doing, she cut across the bow of the Thirtle.

Graham, Pilot of the Thirtle, in attempting to correct the sheer and to avoid crashing into the Bethlehem dock, gave orders to the port tug to pull and to the starboard tug to push; he ordered "Full Astern" and also dropped the port anchor, and although the orders were promptly executed, the vessel continued to drift starboard and rammed into the Bethlehem dock. The Pilot's orders were given within one minute before the crash.

Graham and others on board the Thirtle assert that the proper maneuver to correct the sheer would have been "Half" or "Full Ahead" but this could not be executed because of the extreme danger of a collision with the Dolphin which, in view of the Dolphin's light and gassy condition, would have been catastrophic.

As usual, there are substantial variances in estimates of distance and time.[1] In some respects, witnesses' versions are irreconcilable and individual witnesses' testimony abounds with inconsistencies. Also, the not uncommon situation has developed where each vessel has a theory which vindicates itself and condemns the other, with the crew of each espousing the particular theory which exonerates their vessel.[2]

The Pilot, the Master and the accompanying Pilot on board the bridge of the Thirtle, all familiar with the Kill, contend that the starboard overtaking in the bend was hazardous and that since the Dolphin received no reply to its passing signal, it should not have continued.

The Dolphin, on the other hand, claims it did not cut across the bow of the Thirtle and that it had overtaken the Thirtle in sufficient time to enable the latter to negotiate the course without difficulty. Specifically, it claims that Pilot Graham's orders to regain steerage were given too late; that steerage was lost due to the Thirtle's own faulty navigation; and finally, that the port tug went ahead on its engines instead of reversing them, thus forcing the Thirtle farther toward the starboard bank.

■ After observation of the witnesses, an examination of my trial notes, a thorough study of the trial minutes, the depositions and the exhibits, I am persuaded that the Thirtle and the Dolphin both must share the blame for the Thirtle's crash into the Bethlehem dock.

The evidence is compelling that the Pilot's orders were not given until within a minute before the crash. The orders

1. See The Georgic, D.C.S.D.N.Y.1910, 180 F. 863. See also The Domira, D.C.E.D. N.Y.1931, 49 F.2d 324, affirmed 2 Cir., 1932, 56 F.2d 585.

2. Cf. City of Paris, 1869, 9 Wall. 634, 76 U.S. 634, 636, 19 L.Ed. 751.

were given too late. Under existing conditions the Thirtle's course could not have been arrested in one minute. The Pilot of the Thirtle was fully aware of the danger presented by the Dolphin passing at the bend without his assent and the overcrowding condition that resulted. In fact, he testified that any passage in the 40° bend was hazardous. The Thirtle, according to Graham, started to lose steerage four minutes before she rammed into the dock. Natiello, Third Mate on the Thirtle, says it was three minutes before the crash. In any event, had the orders been given when the Thirtle first lost steerage, she could have regained it in sufficient time to have averted the result. Further, although the Pilot did not hear the blast for passing which the Dolphin alleges was given, he saw her approach and, aware that it was not safe for the Dolphin to pass, should have given warning.

The belated disavowal by libellant of the reliability of the estimates of time and distance given by its own witness, Pilot Graham, is insufficient to overcome the force of other evidence, as well as portions of Graham's own testimony which justify the conclusion that had he exercised due care when he first became aware of the dangerous situation created by the Dolphin, he could have brought his vessel under control.

As for the Dolphin, she is chargeable with fault for violation of Article 18, Rule VIII[3] and for overtaking the Thirtle in a 40° bend in the channel, which was not a safe place to execute the passage. The Dolphin so embarrassed the Thirtle after she started to lose steerageway that she could not go ahead on her engines without risk of a calamitous collision.

The Dolphin claims she gave a passing signal but concedes she did not receive an assenting blast from the Thirtle. Nonetheless, she undertook passage. She seeks to overcome her violation of the Rule by contending that her Master, after giving the signal for overtaking the Thirtle, observed someone aboard the Thirtle looking back and that such person (he assumed it was the Pilot) saw the passing maneuver and that this was acquiescence and equivalent to an assenting signal; and further, that the Thirtle gave no danger signal signifying that it was safe to overtake her and accordingly the Dolphin's violation could not have contributed to the embarrassment of the Thirtle.

The alleged appearance of an unidentified person on the deck of an overtaken vessel is hardly a substitute for the assent required under the Rule. To permit it would mean emasculation of the requirement that affirmative assent be given by the overtaken vessel and would defeat the salutary purpose of the Rules for the protection of life and property.[4]

The Dolphin, as the overtaking vessel, was bound to keep out of the way of the Thirtle not only during the actual passing but until she was finally past and cleared.[5] This she failed to do. Indeed, the Rule is explicit in its provision that " * * * under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can safely be done."[6]

The 40° bend was not such a place under the conditions prevailing. The failure of the Thirtle either to answer with a one-blast signal or with a danger signal does not excuse the imprudent navigation of the Dolphin which created a crowding situation at the bend and compelled her to cut across the bow of the Thirtle to avoid crashing into the Bethlehem pier or going aground in the bank.

The Dolphin contends that all she did was to follow the normal course of the channel—that this is what the Thirtle was attempting to do, but could not, because of her sheer to starboard, and that this gives the impression that she, the

3. 33 U.S.C.A. § 203.

4. See The Cayuga, 1871, 14 Wall. 270, 81 U.S. 270, 275, 20 L.Ed. 828.

5. Socony-Vacuum Oil Co. v. Smith, 5 Cir., 1950, 179 F.2d 672.

6. 33 U.S.C.A. § 203.

Dolphin, cut across the bow of the Thirtle.

What is lost sight of is that the channel at the point where the Dolphin started to and overtook the Thirtle is somewhat less than 600 feet wide; that the Thirtle, 604 feet in length, is longer than the width of the channel; as one witness put it, she "was just about taking up the entire channel"; that the Thirtle was losing steerageway which it could regain only by engines "Ahead", but that this maneuver could not be executed because she would go in a straight line before responding to the rudder with consequent danger of crashing into the Dolphin. It was just too close for comfort.

Thus, the Dolphin not only violated Rule VIII by not waiting for the assenting signal but also by passing before it could safely be done. The violation brings into play the Pennsylvania Rule.[7] The Dolphin has failed to show that her violation could not have contributed to the occurrence. There is no support for the Dolphin's contention that the Pennsylvania Rule is inapplicable since there was no collision between the vessels. Indeed the rule is to the contrary,[8] and our own Court of Appeals has acknowledged that seeming support of such a doctrine was erroneous.[9]

As to the tugs which were impleaded by the Dolphin, there is no credible evidence to support any claim of liability against them. The respondent charged the Matton, the starboard tug, with inefficiency in not being able to assist the Thirtle and to straighten her out on her course, and the Dalzelleader, the port tug, with pushing instead of pulling contrary to the Pilot's orders. Each tug responded properly and promptly to the orders and there is no basis for the claims asserted against them.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Either party, within five days from the date hereof, may propose seriatim or additional Findings of Fact and Conclusions of Law.

Submit decree accordingly.

7. The Pennsylvania, 1873, 19 Wall. 125, 86 U.S. 125, 136.

8. See Richelieu and Ontario Navigation Co. v. Boston Marine Ins. Co., 1890, 136 U.S. 408, 422–423, 10 S.Ct. 934, 34 L.Ed. 398.

9. Great Lakes Dredge & Dock Co. v. The Santiago, 2 Cir., 1946, 155 F.2d 148, 150, note 7:

"[W]e take this occasion to say that we were in error in suggesting in The Nanuet, 2 Cir., 55 F.2d 222, 223, that a vessel need not prove that her fault 'could not have contributed to a collision between other boats, when she herself collides with neither'."