OIL TRANSFER CORPORATION, as owner of THE M/V OTCO BAYWAY, and Continental Oil Company, Libelants,

v.

ATLANTIC TANKERS, LTD., as owner of THE tanker ATLANTIC PRINCE, Respondent.

United States District Court
S. D. New York.
Dec. 15, 1960.

Macklin, Speer, Hannan & McKernan, New York City, for libelants.

Foley & Martin, New York City, for respondent.

MacMAHON, District Judge.

These are cross-libels arising out of a collision between two tankers in the Kill van Kull. The owners of the tankers libelled each other, and Continental Oil Company, the owner of the cargo aboard the Otco Bayway, libelled the Atlantic Prince, whose owner, Atlantic Tankers, Ltd., in turn, impleaded Oil Transfer Corporation, the owner of the Otco Bayway. At the trial, the Court granted a motion to consolidate all three actions under the title of the first action.

At the time of the accident, which occurred about 4:45 a. m. on January 6, 1959, the set of the tide was northwest into the Kill, at the last hour of the flood. The night was cold, with the temperature hovering about 10 degrees, visibility about 5 miles, and the wind was strong from the northwest against the direction of the tide, with a velocity of 20 to 29 miles per hour.

The Atlantic Prince was a fully loaded small super tanker, 551 feet 6 inches long, with a 32 foot draft, bound from the Stapleton anchorage through the Kill van Kull to Linden, New Jersey. She had a 1,000 horsepower tug at each bow, each with a line aboard the Atlantic Prince but neither using her power.

The Otco Bayway, a smaller single screw tanker, with an overall length of 242 feet 3 inches and a draft of about 12 feet, was adrift broadside in the channel with her bow headed southeast towards Staten Island, between buoys C–1 and C–3, about 300 feet west and 100 feet north of buoy C–1, which marked the southern line of the channel.[1]

The Otco Bayway's version of the collision may be stated as follows: The Otco Bayway left Baltimore, Maryland with a seventeen man crew at about 2:00 a. m. on January 4, 1959, bound for Quincy, Massachusetts, with a cargo of Neolene 400 in three of her seven tanks—tanks 2, 4 and 6. The Otco Bayway's engines, instruments and navigational gear had been tested and found operative before she left Baltimore.

As the Otco Bayway proceeded along the New Jersey coast, she was awash most of the time due to heavy seas and high winds which she encountered. As a result, a large amount of ice encrusted the ship, in some places as much as two feet thick. Enroute, it was decided to put in at Constable Hook, New Jersey in order to take on fuel. The ship passed Scotland Light and entered inland waters at 2:08 a. m. on January 6th.

At about 3:50 a. m., when the ship was off Tompkinsville, Staten Island, the chief mate, Hegna, who was not a licensed pilot, took over the helm on the four-to-eight watch and steered the Otco Bayway toward the Esso Pier at Constable Hook. Hegna immediately ordered two deck hands to go forward to chop ice from the capstans and windlasses in order to lay out the lines preparatory to tying up at the dock.

Shortly after 4:00 a. m., The Otco Bayway came to a complete stop between buoys C–1 and C–3 and then maneuvered to get into position for docking. As the ship approached the dock, Hegna signaled the engine room to slow and then to stop. Nelson, the engineer on watch, was able to execute each order, except the final order to stop. He advised the bridge that he could not stop the engine, and Hegna ordered a hard right rudder to avoid hitting the dock. The Otco Bayway then turned about, heading back into the channel.

Chief Engineer Coombs was then summoned, and he disconnected the fuel lines, stopping the vessel at about 4:20 a. m. The Otco Bayway was then at a point about midway between buoys C–1 and C–3 and N–2 and N–4, about 100 yards east of the entrance and about 500 yards

---

1. All locations referred to are shown on Coast & Geodetic Survey Chart 285, in evidence as Libelant's Exhibit 4.

north of the center line of the Kill van Kull channel. This point is almost 400 yards from the northwest end of the Constable Hook range and about 600 yards from the point of the collision.

Almost immediately after the Otco Bayway's engine stopped, Hegna began sounding a series of short blasts and using a searchlight to attract assistance. He also ordered the two men on deck to drop the anchors. Cordes, one of the deck hands, testified that they were unable to free the anchors because both the deck claw holding the chain and the hawser pipe were encrusted with thick ice. The Otco Bayway had lost way in making the turn and, left to the mercy of the northwest wind, soon began to drift towards Staten Island.

Hegna testified that shortly after the Otco Bayway stopped, he saw the Atlantic Prince swinging onto the Constable Hook range but did not pay much attention to her because he was sure that she would see the Otco Bayway. He testified that he assumed the Atlantic Prince would pass the Otco Bayway's stern, and that he did not hear any signals from the Atlantic Prince until she was about 100 feet away when the collision was inevitable. According to Hegna, the collision occurred at 4:44 a. m.

The Atlantic Prince's version, as one would expect, is somewhat different. Captain Lodden, the pilot aboard the Atlantic Prince, testified that she left the Stapleton anchorage about 4:25 a. m. and reached the Constable Hook range at about 4:35 a. m., where she assumed a 290 degree bearing and proceeded at about five or six knots. The Atlantic Prince was then at a point about a mile and a half southeast of the Otco Bayway.

Captain Lodden testified on two separate days, and the times which he gave on his second day of testimony, while under cross-examination, will be accepted here.[2] He testified that the first saw the red light on the port side of the Otco Bayway at 4:40 a. m., and that he was unable to distinguish the size of the vessel because of the red and green lights and the oil docks in the background. He also said that he could not see the superstructure or the stern of the Otco Bayway. At that time, 4:40 a. m., according to Lodden, the Atlantic Prince signaled one blast to indicate an intention to pass astern of the Otco Bayway. Before receiving a response, the Atlantic Prince swung left preparatory to changing her course to a 240 degree bearing to enter the Kills.

About a minute or two later, the Atlantic Prince signaled two blasts to indicate an intention to cross the bow of the Otco Bayway. Almost immediately, those aboard the Atlantic Prince heard a number of short blasts from the Otco Bayway which, at the same time, illuminated her entire length with the searchlight. About 400 feet then separated the vessels.

The Atlantic Prince was immediately ordered full astern. The tug on her port bow was also ordered full astern. The tug on her starboard bow was ordered ahead, and the Atlantic Prince's port anchor was dropped. Nevertheless, about three or four minutes later, at 4:46 a. m., according to Captain Lodden, the collision occurred.

There were three other vessels in the immediate area: the tugs Gene Pope and The Hustler, which were proceeding easterly in the Kills; and a large unnamed vessel which was following the Atlantic Prince.

Captain Connard, aboard the Gene Pope, testified that he saw the Otco Bayway's searchlight when about three quarters of a mile west of the Otco Bayway and heard her signal when he was about a quarter of a mile away. He testified that the use of the searchlight by the Otco Bayway did not indicate to him that anything was wrong with the vessel, but

2. Lodden put the collision at 4:46 a. m. on both days. On his first day of testimony, he gave 4:36 a. m. and 4:38 a. m. as the times of the Atlantic Prince's one and two blast signals. When recalled, he gave 4:40 a. m. and 4:42 a. m. as the times of the signals, reducing the gap between the last signal and the collision from eight to four minutes.

when he heard the short blasts, he proceeded to the Otco Bayway and was told by someone aboard that she had broken down and needed assistance.

While the Gene Pope was attempting to put a line aboard the starboard side of the Otco Bayway, Connard, who had seen the Atlantic Prince when she was about 3,000 feet from the Otco Bayway, realized that a collision was imminent, and the Gene Pope backed away. Connard testified that he did not notice any change in the Atlantic Prince's course and heard no signals from her until he heard the Otco Bayway's danger signal just prior to the collision.

Garrity, the mate on the tug Hustler which was also owned by Oil Transfer Corporation, testified that he heard a continuous signal from the Otco Bayway from about 4:35 a. m., and that he observed the Atlantic Prince for about ten minutes before the collision, during which time he heard no signals from her. He also estimated the Atlantic Prince's speed at about nine or ten miles per hour. No witnesses were produced from the vessel following the Atlantic Prince.

■ On all the evidence, the Court finds that the collision was occasioned by the equal fault of both vessels. This conclusion is based on the following facts:

■ There is little question as to the liability of the Atlantic Prince. She violated at least three of the applicable Inland Rules, all of which contributed to the cause of the collision.

Captain Lodden admitted that the Otco Bayway had the right of way, and the Atlantic Prince, under Article 19 of the Inland Rules, 33 U.S.C.A. § 204, had the burden of keeping out of her way.

■ The Atlantic Prince, as the burdened vessel, also had a duty, under Article 22 of the Inland Rules, 33 U.S.C.A. § 207, to avoid crossing ahead of the Otco Bayway. Instead, Captain Lodden testified that the Atlantic Prince attempted to cross the Otco Bayway's bow. Furthermore, when the Atlantic Prince failed to receive a response to its first signal for a port crossing, she had a duty,

under Article 23 of the Inland Rules, 33 U.S.C.A. § 208, to slacken speed, stop or reverse. Ohio Barge Line, Inc. v. Oil Transport Co., Inc., 5 Cir., 1960, 280 F. 2d 448; The Quogue, 2 Cir., 1931, 47 F. 2d 873; A. H. Bull S. S. Co. v. United States, 2 Cir., 1929, 34 F.2d 614. The Atlantic Prince, however, continued on for a minute and then gave a two-blast signal to indicate a starboard crossing.

The Atlantic Prince also had the duty, under Article 25 of the Inland Rules, 33 U.S.C.A. § 210, to keep to that side of the channel lying on her starboard side. Captain Lodden testified that because of the shallow water just beyond the starboard side of the channel, and in order to make a necessary 50 degree port swing, he directed the Atlantic Prince along the port side of the fairway.

■ Under the rule of The Pennsylvania, 1873, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, a vessel guilty of a statutory fault is presumed to have contributed to the accident and can only escape liability if she shows that she could not have contributed to causing the collision. Sinclair Refining Co. v. The Morania Dolphin, D.C.S.D.N.Y., 170 F.Supp. 586, affirmed 2 Cir., 1959, 272 F.2d 192. There was no evidence offered by the cross-libelant to rebut the presumption imposed by The Pennsylvania rule. When pressed for an explanation of what had caused the collision, Captain Lodden's only reply was that it had been caused by the poor seamanship of the Otco Bayway's crew. An examination of all the evidence leads to the conclusion that the poor seamanship of the Otco Bayway was a contributing cause of the collision.

■ The Otco Bayway contends that as a drifting vessel, she was privileged and should have been avoided by the Atlantic Prince. This contention is without foundation. If it were apparent that the Otco Bayway was not under power, for example, if she were alongside a quarantine station being inspected, flying an inspection flag, other vessels would have a duty to avoid her. But all the evidence here leads to the conclusion that she was moving very slowly in a westerly

direction, and it was not apparent that she was drifting. The Col. John F. Gaynor, 3 Cir., 1904, 130 F. 856. Furthermore, there is a presumption of negligence on the part of a drifting vessel. She must be held responsible for the resulting damage unless she can show affirmatively that the drifting was the result of inevitable accident or a *vis major* which human skill and precaution and a proper display of nautical skill could have prevented. The Louisiana, 1865, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85; Patapsco Scrap Corp. v. Maryland Shipbuilding & Drydock Co., 4 Cir., 1959, 268 F.2d 817; see, Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co., 2 Cir., 33 F.2d 272, 274, certiorari denied, New York Marine Co. v. Cranberry Creek Coal Co., 1929, 280 U.S. 596, 50 S.Ct. 67, 74 L.Ed. 643.

■ If a collision results from the failure of a ship's engine, the defense of inevitable accident is upheld only if the proof is convincing that the defect was really latent, and that it could not have been discovered by the exercise of due diligence. The mere fact of failure, unexplained, does not warrant a finding of inevitable accident. The Westchester, 2 Cir., 1918, 254 F. 576; Griffin on Collision § 241(5).

In The Lackawanna, 2 Cir., 1913, 210 F. 262, 263, the defense of inevitable accident was not sustained where there was evidence of an earlier inspection of bolts which had broken in the steering gear, but the bolts were not produced at the trial and the explanation of their disappearance was not satisfactory.

■ Here, Gross, the marine superintendent for Oil Transfer Corporation, testified that the faulty part was no larger than a pencil. It was replaced, but Gross gave no satisfactory explanation for failure to produce it at the trial. The inference seems clear that the faulty part itself would show that ordinary care and inspection would have revealed the defect. Furthermore, the defense fails unless it is shown that the collision could not have been avoided by proper navigation after the engine breakdown. The Lackawanna, supra.

It is obvious from all the evidence that the crew of the Otco Bayway, oblivious to her perilous situation, took no affirmative action to avoid the risk of collision but deliberately let the Otco Bayway drift in one of the busiest waterways in New York harbor.

Both Coombs and Nelson testified that the engines could have been started and that the Otco Bayway could have executed every navigational order other than reverse. Hegna testified that the nine foot mark on Chart 285, near the Esso dock, was "plenty of water" for the Otco Bayway. The same chart shows that there was about a mile of water of at least the same depth northeast of the Esso dock outside of any channel where the Otco Bayway could have maneuvered without menacing navigation until she received assistance.

Libelant contends that the proposal that the Otco Bayway navigate while unable to execute every maneuver is "astounding" and would require the Otco Bayway to commit an act of gross negligence. The cases relied on in support of this contention involve situations where vessels were proceeding at a speed which, under the circumstances, was immoderate and beyond the braking capacity of the vessels. The Albert Dumois, 1900, 177 U.S. 240, 20 S.Ct. 595, 44 L.Ed. 751; The Silverpalm, 9 Cir., 1937, 94 F.2d 776; The Sakito Maru, D.C.S.D.Cal.1941, 41 F.Supp. 769, modified on other grounds, sub nom., Carr v. Hermosa Amusement Corp., 9 Cir., 1943, 137 F.2d 983, certiorari denied, Hermosa Amusement Corp. v. Carr, 1944, 321 U.S. 764, 64 S.Ct. 520, 88 L.Ed. 1060.

■ The law does not require a navigator to commit an act of gross negligence, but it does require exercise of a reasonable degree of skill and judgment such as might reasonably be expected of a man of his calling in the circumstances in which he was placed. The Wollaston, D.C.S.D.N.Y.1945, 62 F.Supp. 284, affirmed, Martin Marine Transportation

Co. v. The Bermuda, 2 Cir., 1946, 157 F.2d 431; Griffin on Collision § 204.

More than twenty minutes elapsed from the time the engines were stopped until the collision. During that time, Hegna and the Captain of the Otco Bayway should have realized the gravity of their situation, their possible alternatives, and exercised sufficient judgment to avoid the risk of collision.

The testimony of the Otco Bayway's witnesses shows conclusively that she was a sleeping vessel indifferent to sound navigation and oblivious to her perilous situation and to the menace she constituted to navigation in a busy waterway. She failed to accept the fact that there existed a continuing duty on her part to avoid not only collision but the risk of collision. Ocean S. S. Co. of Savannah v. United States, 2 Cir., 1930, 38 F.2d 782, 784.

Here was a ship confronted with a sudden emergency laden with the peril of collision. She was obliged to take all reasonable steps to avert the foreseeable danger of collision with ships plying a busy channel. Yet those in command of her not only failed to perceive the danger, but were utterly oblivious to the peril caused by her obstruction of this narrow and congested channel. Ordinary caution should have suggested a number of alternatives to drifting helplessly for even twenty minutes. Hegna admitted that his most important duty in his ship's predicament was to free the anchors. Yet, although other men were readily available, he failed to order any of them to assist the two men on watch. He failed to use the Otco Bayway's telephone to call his office or the Coast Guard for assistance, although he did so immediately after the collision. He failed to start the engines and maneuver the Otco Bayway into safer waters easily reached.

Section 364 of Title 46, U.S.C. A., requires all vessels in inland waters to be under the control of a licensed pilot. Hegna was not a licensed pilot. There is some authority for the proposition that a violation of a requirement such as Section 364 does not constitute a statutory fault since it does not pertain directly to a rule of navigation. Griffin on Collision § 254. The Court of Appeals for this Circuit, however, has held in a similar situation that the absence of a required deck hand was a statutory fault subject to the operation of The Pennsylvania rule. The New York Marine Number 10, 2 Cir., 1940, 109 F.2d 564. See, also, United States v. Wessel Duval & Co., D.C.S.D.N.Y.1954, 123 F.Supp. 318, 335.

If Hegna had been a licensed pilot, his training and skill would have undoubtedly prompted realization that the Otco Bayway, 242 feet long lying broadside in an 800 foot channel was a menace to navigation. He would have realized that her low freeboard and the background lights made the Otco Bayway almost invisible to oncoming vessels with no reason to suspect either her presence or her helpless condition. At the very least, ordinary care cried for moving the vessel out of the fairway. It would have been obvious to a skilled pilot that unless the Otco Bayway were maneuvered out of the way of oncoming traffic, the danger of collision was great. The fact, therefore, that the Otco Bayway was not under the control of a licensed pilot contributed to the cause of the collision.

The authorities are not clear as to the status of lights to be displayed on vessels in inland waters when drifting and out-of-command. Rule 4(a) of the International Rules, 33 U.S.C.A. § 145b (a), provides that a vessel which is not under command shall carry two all around red lights with two-mile visibility, one above the other, not less than six feet apart. The Inland Rules contain no specific provision for out-of-command lights. Cabins Tankers Industries, Inc. v. M/V The Rio Maracana, D.C.E.D.Va. 1960, 182 F.Supp. 811; Griffin on Collision § 95.

Article 31 of the Inland Rules, 33 U. S.C.A. § 231, provides for distress signals as follows:

"When a vessel is in distress and requires assistance from other ves-

sels or from the shore the following shall be the signals to be used or displayed by her, either together or separately, namely:

\*   \*   \*   \*   \*   \*

"At night.—First. Flames on the vessel as from a burning tar barrel, oil barrel, and so forth.

"Second. A continuous sounding with any fog-signal apparatus, or firing a gun.".

Hegna's testimony shows that he believed Article 31 was controlling in the Otco Bayway's situation, and that he attempted to comply with its mandate.

Although cases interpreting Article 31 are rare, it has been held that it requires not merely any attempt to seek assistance, but a duty to warn other vessels of the disabled status of the vessel. Intagliata v. Shipowners & Merchants Towboat Co., Ltd., 1945, 26 Cal.2d 365, 159 P.2d 1. This interpretation appears to be in accord with Article 29, 33 U.S.C.A. § 221, which provides that no vessel shall be exonerated if she neglects to take any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case. The Roslyn, D.C.S.D.N.Y.1884, 22 F. 687. Under Article 29, disabled vessels are required to give danger signals.

■ There is ample testimony that the Otco Bayway used its searchlight to attract assistance although both Captain Connard and Captain Johansen testified that a searchlight was not a recognized distress signal. It could scarcely be contended that a tanker is negligent in failing to use flames from a tar or oil barrel to indicate her disability, but the spirit of the rule requires some extraordinary light which will serve the obvious purpose of illuminating the vessel and attracting attention as a clear warning of her distress. No such precautions were taken here. The testimony of both Hegna and Connard was that the searchlight

was not played on the vessel but swept around on the surrounding waters.

■ Captains Johansen and Lodden testified that the searchlight did not reveal the entire vessel until the collision was unavoidable. It is obvious from the purpose behind the archaic rule that a roving searchlight having no recognized significance is not the type of distress signal required by the statute. If the searchlight had been used to illuminate the entire vessel earlier, it would have met the requirement of the rule. In this case, however, the searchlight was not used properly until too late to warn oncoming vessels of the Otco Bayway's disability, and the earlier use was not compliance with the rule.

■ Article 31 also requires a "distress signal" consisting of a continuous sounding with any fog-signal apparatus. Rule III of Article 18, 33 U.S.C.A. § 203, requires approaching vessels to signify any uncertainty in the other's course or intention by giving a danger signal, "several short and rapid blasts, not less than four, of the steam whistle." Under either rule, therefore, the Otco Bayway was required to sound a continuous signal during the entire time she was disabled, since Hegna admitted that he was uncertain about the course of the Atlantic Prince.

Several witnesses testified to hearing a continuous sounding from the Otco Bayway. The infirmities of our language now produce a problem not apparent at the trial. Did those witnesses mean a signal continuously given for the twenty-five odd minutes that the Otco Bayway was disabled before the collision, or a series of short blasts given at different times? An examination of all the circumstances compels a conclusion that except for the testimony of Hegna, Garrity[3] and Coombs, who were employees of the Oil Transfer Corporation, the witnesses were referring to the latter.

---

3. Garrity's testimony as to the observation of the Atlantic Prince and her speed was entirely too partisan and incredible to place weight on his testimony as to the Otco Bayway's signals.

There is no dispute that the Otco Bayway sounded a continuous "distress signal", a series of short blasts, several minutes before the collision, and a "danger signal", also consisting of a series of short blasts, in the four minutes prior to the collision after the Atlantic Prince's two-blast signal. Whether she sounded continuously in the interim is not as clear.

Hegna testified that he gave a series of four short blasts continuously from 4:20 a. m. until the collision. Garrity and Connard, who were in the Kills, heard the signals about ten minutes before the collision. The Gene Pope was then a quarter of a mile away from the Otco Bayway, and she reached the Otco Bayway at least a couple of minutes before the collision.

It is probable that Garrity and Connard heard the signals at the same time. The Atlantic Prince was then at least three-quarters of a mile away on the Constable Hook range because she was still a thousand yards away when the Gene Pope reached the Otco Bayway.

Palu, the mate who had been relieved by Hegna, testified that he had gone below and heard the "danger signal" while in bed. He testified that about fifteen or twenty minutes later, he felt the impact of the crash.

Cordes, one of the crewmen chopping ice, testified that when he heard the "danger signal", he went amidship, saw the Atlantic Prince, and had only enough time to go around to the starboard side of the wheelhouse before the collision.

Captains Johansen and Lodden testified that they heard no signals from the Otco Bayway until after the Atlantic Prince's two-blast signal for a starboard crossing.

The testimony of Cordes, when considered with the general apathy that enveloped the Otco Bayway, is more credible than that of the other Otco Bayway witnesses. He followed the logical course. He was aroused by the series of short blasts and conducted his own investigation. If he had heard a continuous sounding of short blasts for the previous twenty-five minutes, which Hegna claimed he gave, the signal just prior to the collision would have had no particular significance for him.

Both Lodden and Johansen testified that the Atlantic Prince blew one whistle blast to signal a port crossing and shortly thereafter, before receiving an answer, a two-blast signal to indicate a starboard crossing. The frankness and candor of those witnesses to so obvious a fault on the Atlantic Prince's part impels a conclusion that their testimony is true. If their testimony is true, it is further support for a finding that the Otco Bayway did not sound a continuous series of short blasts for, if it did, the Atlantic Prince would have heard them at least during that period between her own signals.

■ In view of all of the circumstances, the Court finds that the Otco Bayway sounded a series of short blasts until it attracted the attention of the Gene Pope and again just prior to the collision, but not in the interim, and that the failure to sound continuously constituted a violation of Articles 18 and 31 of the Inland Rules. Sinclair Refining Co. v. The Morania Dolphin, supra.

The failure of the Otco Bayway to sound continuous signals was a contributing cause of the collision. Captain Johansen was the only disinterested witness, other than Captain Connard, who testified to the details leading up to the collision. He testified that the Atlantic Prince took immediate braking action when the Otco Bayway's situation was revealed. The testimony of the Otco Bayway witnesses, Garrity and Coombs, to the effect that the Atlantic Prince was stopped after the collision, and the photograph showing the damage to the Otco Bayway (Exhibit D–7), corroborate his testimony. It is reasonable to conclude, therefore, that if the Otco Bayway had correctly disclosed her disability at an earlier time, the Atlantic Prince would have been able to avoid the collision.

The Otco Bayway also violated Article 29, 33 U.S.C.A. § 221, by neglecting to keep a proper lookout. Hegna testified that when he began the four-to-eight watch, the Captain was in the wheelhouse and two other seamen were on watch. Both of these men were kept busy either preparing to dock the vessel or attempting to free the anchors. Neither man acted solely as a lookout. There was ample testimony, however, that those in the wheelhouse of the Otco Bayway knew of the presence of the Atlantic Prince and that a lookout would not have given them any further information which would have enabled the Otco Bayway to avoid the collision. Afran Trans. Co. v. The Bergechief, D.C.S.D.N.Y.1959, 170 F.Supp. 893, 901, affirmed 2 Cir., 1960, 274 F.2d 469; Griffin on Collision § 102.

The absence of a lookout, therefore, did not contribute to the collision, but it confirms the conclusion that the Otco Bayway was recklessly unaware of the peril she created and was negligent in failing to take appropriate action to avoid the collision that ensued.

Accordingly, Continental Oil Company, the owner of the Neolene 400, is entitled to an interlocutory decree against Atlantic Tankers, Ltd. for one-half of the damage Continental sustained as a result of the collision, together with costs and such interest, if any, as this Court may determine upon the entry of a final decree. Continental is also entitled to a decree against Oil Transfer Corporation for one-half of the damages Continental sustained as a result of the collision, together with costs and such interest, if any, as this Court may determine upon the entry of a final decree.

Oil Transfer Corporation is entitled to an interlocutory decree against Atlantic Tankers, Ltd., for one-half of the damages sustained by the Otco Bayway as a result of the collision, together with costs and such interest, if any, as this Court may determine upon the entry of a final decree.

Atlantic Tankers, Ltd. is entitled to an interlocutory decree against Oil Transfer Corporation for one-half of the damages sustained by the Atlantic Prince as a result of the collision, together with costs and such interest, if any, as this Court may determine upon the entry of a final decree.

The amount of the damages to the respective vessels and to the cargo is to be determined by a Special Master to whom this matter is to be referred for such purpose.

This memorandum shall constitute the Court's findings of fact and conclusions of law, in accordance with General Admiralty Rule 46½, 28 U.S.C.A.

Submit interlocutory decree on notice, in accordance with the foregoing.